ALASKA DEPARTMENT OF ENVIRONMENTAL
CONSERVATION *v.* ENVIRONMENTAL
PROTECTION AGENCY ET AL.

No. 02–658.   Argued October 8, 2003—Decided January 21, 2004

462

464

466

GINSBURG, J., delivered the opinion of the Court, in which STEVENS, O'CONNOR, SOUTER, and BREYER, JJ., joined. KENNEDY, J., filed a dissenting opinion, in which REHNQUIST, C. J., and SCALIA and THOMAS, JJ., joined, *post*, p. 502.

*Jonathan S. Franklin* argued the cause for petitioner. With him on the briefs were *John G. Roberts, Jr., Lorane F. Hebert, Gregg D. Renkes,* Attorney General of Alaska, and *Cameron M. Leonard,* Assistant Attorney General. *Robert J. Mahoney, Robert T. Connery,* and *Marcy G. Glenn* filed briefs in support of petitioner for Teck Cominco Alaska Inc., respondent under this Court's Rule 12.6.

*Deputy Solicitor General Hungar* argued the cause for respondents. With him on the brief were *Solicitor General Olson, Acting Assistant Attorney General Johnson, Deputy Solicitor General Kneedler, James A. Feldman, Andrew J. Doyle, Robert E. Fabricant, Carol S. Holmes,* and *Juliane R. B. Matthews.*[*]

---

[*]Briefs of *amici curiae* urging reversal were filed for the State of North Dakota et al. by *Wayne Stenehjem,* Attorney General of North Dakota, *Lyle Witham,* Assistant Attorney General, *Patrick J. Crank,* Attorney General of Wyoming, and *Theodore C. Preston,* Assistant Attorney General, and by the Attorneys General for their respective States as follows: *William H. Pryor, Jr.,* of Alabama, *M. Jane Brady* of Delaware, *Thomas J. Miller* of Iowa, *Jon Bruning* of Nebraska, *Brian Sandoval* of Nevada, *W. A. Drew Edmondson* of Oklahoma, *Larry Long* of South Dakota, *Mark L. Shurtleff* of Utah, and *Jerry W. Kilgore* of Virginia; for NANA Regional Corp., Inc., by *James E. Torgerson* and *Matthew Cohen;* for the National Environmental Development Association et al. by *Janet Pitterle Holt;* and for the Pacific Legal Foundation by *M. Reed Hopper* and *Robin L. Rivett.*

Briefs of *amici curiae* urging affirmance were filed for the State of Vermont et al. by *William H. Sorrell,* Attorney General of Vermont, and *Kevin O. Leske* and *Erick Titrud,* Assistant Attorneys General, and by the Attorneys General for their respective States as follows: *Bill Lockyer*

JUSTICE GINSBURG delivered the opinion of the Court.

This case concerns the authority of the Environmental Protection Agency (EPA or Agency) to enforce the provisions of the Clean Air Act's (CAA or Act) Prevention of Significant Deterioration (PSD) program. Under that program, no major air pollutant emitting facility may be constructed unless the facility is equipped with "the best available control technology" (BACT). As added by § 165, 91 Stat. 735, and amended, 42 U. S. C. § 7475(a)(4). BACT, as defined in the CAA, means, for any major air pollutant emitting facility, "an emission limitation based on the maximum degree of [pollutant] reduction . . . which the permitting authority, on a case-by-case basis, taking into account energy, environmental, and economic impacts and other costs, determines is achievable for [the] facility. . . ." § 7479(3).

Regarding EPA oversight, the Act includes a general instruction and one geared specifically to the PSD program. The general prescription, § 113(a)(5) of the Act, authorizes EPA, when it finds that a State is not complying with a CAA requirement governing construction of a pollutant source, to issue an order prohibiting construction, to prescribe an administrative penalty, or to commence a civil action for injunctive relief. 42 U. S. C. § 7413(a). Directed specifically to the PSD program, CAA § 167 instructs EPA to "take such measures, including issuance of an order, or seeking in-

of California, *Richard Blumenthal* of Connecticut, *G. Steven Rowe* of Maine, *Thomas F. Reilly* of Massachusetts, *Michael A. Cox* of Michigan, *Peter W. Heed* of New Hampshire, *Peter C. Harvey* of New Jersey, *Eliot Spitzer* of New York, *Hardy Myers* of Oregon, *Patrick C. Lynch* of Rhode Island, and *Peggy A. Lautenschlager* of Wisconsin; for Environmental Defense et al. by *Sean H. Donahue;* and for the Native Village of Kivalina, Alaska, by *Michael J. Frank* and *Peter Van Tuyn.*

Briefs of *amici curiae* were filed for the Center for Energy and Economic Development by *Paul M. Seby;* and for the Northwest Environmental Defense Center by *Donald B. Potter.*

junctive relief, as necessary to prevent the construction" of a major pollutant emitting facility that does not conform to the PSD requirements of the Act. 42 U. S. C. § 7477.

In the case before us, "the permitting authority" under § 7479(3) is the State of Alaska, acting through Alaska's Department of Environmental Conservation (ADEC). The question presented is what role EPA has with respect to ADEC's BACT determinations. Specifically, may EPA act to block construction of a new major pollutant emitting facility permitted by ADEC when EPA finds ADEC's BACT determination unreasonable in light of the guides § 7479(3) prescribes? We hold that the Act confers that checking authority on EPA.

## I

### A

Congress enacted the Clean Air Amendments of 1970, 84 Stat. 1676, 42 U. S. C. § 7401 *et seq.*, in response to "dissatisfaction with the progress of existing air pollution programs." *Union Elec. Co.* v. *EPA*, 427 U. S. 246, 249 (1976). The amendments aimed "to guarantee the prompt attainment and maintenance of specified air quality standards." *Ibid.;* D. Currie, Air Pollution § 1.13, p. 1–16 (1981) (summary of 1970 amendments). Added by the 1970 amendments, §§ 108(a) and 109(a) of the Act require EPA to publish lists of emissions that "cause or contribute to air pollution which may reasonably be anticipated to endanger public health or welfare," and to promulgate primary and secondary national ambient air quality standards (NAAQS) for such pollutants. 42 U. S. C. §§ 7408(a) and 7409(a); *Whitman* v. *American Trucking Assns., Inc.*, 531 U. S. 457, 462–463 (2001). NAAQS "define [the] levels of air quality that must be achieved to protect public health and welfare." R. Belden, Clean Air Act 6 (2001). The Agency published initial NAAQS in 1971, *Union Elec.*, 427 U. S., at 251 (citing 40

CFR pt. 50 (1975)), and in 1985, NAAQS for the pollutant at issue in this case, nitrogen dioxide. 40 CFR § 50.11 (2002).[1]

Under § 110 of the Act, also added in 1970, each State must submit for EPA approval "a plan which provides for implementation, maintenance, and enforcement of [NAAQS]." 42 U. S. C. § 7410(a)(1); cf. § 7410(c)(1) (EPA shall promulgate an implementation plan if the State's plan is inadequate). Relevant to this case, EPA has approved Alaska's implementation plan. 48 Fed. Reg. 30626 (1983), as amended, 56 Fed. Reg. 19288 (1991); 40 CFR § 52.96(a) (2002). To gain EPA approval, a "state implementation plan" (SIP) must "include enforceable emission limitations and other control measures, means, or techniques . . . as may be necessary or appropriate to meet the applicable [CAA] requirements." 42 U. S. C. § 7410(a)(2)(A). While States have "wide discretion" in formulating their plans, *Union Elec.*, 427 U. S., at 250, SIPs must include certain measures Congress specified "to assure that national ambient air quality standards are achieved," 42 U. S. C. § 7410(a)(2)(C). Among those measures are permit provisions, § 7475, basic to the administration of the program involved in this case, CAA's "Prevention of Significant Deterioration of Air Quality" (PSD) program.

The PSD requirements, enacted as part of 1977 amendments to the Act, Title I, § 160 *et seq.,* 91 Stat. 731, "are designed to ensure that the air quality in attainment areas or areas that are already 'clean' will not degrade," Belden, *supra,* at 43. See 42 U. S. C. § 7470(1) (purpose of PSD pro-

---

[1] Emissions levels for nitrogen dioxide, a regulated pollutant under the Act, are defined in terms of quantities of all oxides of nitrogen. R. Belden, Clean Air Act 47, n. 11 (2001). "The term nitrogen oxides refers to a family of compounds of nitrogen and oxygen. The principal nitrogen oxides component present in the atmosphere at any time is nitrogen dioxides. Combustion sources emit mostly nitric oxide, with some nitrogen dioxide. Upon entering the atmosphere, the nitric oxide changes rapidly, mostly to nitrogen dioxide." EPA, Prevention of Significant Deterioration for Nitrogen Oxides, 53 Fed. Reg. 40656 (1988). Nitrogen oxides are also termed "NOx."

gram is to "protect public health and welfare from any actual or potential adverse effect which in [EPA's] judgment may reasonably be anticipate[d] to occur from air pollution . . . notwithstanding attainment and maintenance of all national ambient air quality standards"). Before 1977, no CAA provision specifically addressed potential air quality deterioration in areas where pollutant levels were lower than the NAAQS. *Alabama Power Co.* v. *Costle,* 636 F. 2d 323, 346–347 (CADC 1979). Responding to litigation initiated by an environmental group,[2] however, EPA issued regulations in 1974 requiring that SIPs include a PSD program. *Id.,* at 347, and n. 18 (citing 39 Fed. Reg. 42510 (1974)). Three years later, Congress adopted the current PSD program. See S. Rep. No. 95–127, p. 11 (1977) (Congress itself has "a responsibility to delineate a policy for protecting clean air").

The PSD program imposes on States a regime governing areas "designated pursuant to [42 U. S. C. § 7407] as attainment or unclassifiable." § 7471.[3] An attainment area is one in which the air "meets the national primary or secondary ambient air quality standard for [a regulated pollutant]." § 7407(d)(1)(A)(ii). Air in an unclassifiable area "cannot be classified on the basis of available information as meeting or not meeting the national primary or secondary ambient air quality standard for the pollutant." § 7407(d)(1)(A)(iii). *Northwest Alaska, the region this case concerns, is classified* as an attainment or unclassifiable area for nitrogen dioxide, 40 CFR § 81.302 (2002); therefore, the PSD program applies to emissions of that pollutant in the region. In 2002, the Agency reported that "[a]ll areas of the country that once

---

[2] *Sierra Club* v. *Ruckelshaus,* 344 F. Supp. 253 (DC 1972), aff'd *per curiam,* 4 E. R. C. 1815, 2 Env. L. Rep. 20656 (CADC 1972), aff'd by an equally divided court *sub nom. Fri* v. *Sierra Club,* 412 U. S. 541 (1973) *(per curiam).*

[3] The PSD program also requires visibility control measures, 42 U. S. C. §§ 7491–7492, not at issue in this case.

violated the NAAQS for [nitrogen dioxide] now meet that standard." EPA, Latest Findings on National Air Quality 7 (Aug. 2003).

Section 165 of the Act, 42 U. S. C. § 7475, installs a permitting requirement for any "major emitting facility," defined to include any source emitting more than 250 tons of nitrogen oxides per year, § 7479(1). No such facility may be constructed or modified unless a permit prescribing emission limitations has been issued for the facility. § 7475(a)(1); see § 7479(2)(C) (defining "construction" to include "modification"). Alaska's SIP imposes an analogous requirement. 18 Alaska Admin. Code § 50.300(c)(1) (2003). Modifications to major emitting facilities that increase nitrogen oxide emissions in excess of 40 tons per year require a PSD permit. 40 CFR § 51.166(b)(23)(i) (2002); 18 Alaska Admin. Code § 50.300(h)(3)(B)(ii) (2003).

The Act sets out preconditions for the issuance of PSD permits. *Inter alia*, no PSD permit may issue unless "the proposed facility is subject to the best available control technology for each pollutant subject to [CAA] regulation . . . emitted from . . . [the] facility." 42 U. S. C. § 7475(a)(4). As described in the Act's definitional provisions, "best available control technology" (BACT) means:

> "an emission limitation based on the maximum degree of reduction of each pollutant subject to regulation under this chapter emitted from or which results from any major emitting facility, which the permitting authority, on a case-by-case basis, taking into account energy, environmental, and economic impacts and other costs, determines is achievable for such facility through application of production processes and available methods, systems, and techniques . . . . In no event shall application of 'best available control technology' result in emissions of any pollutants which will exceed the emissions allowed by any applicable standard established pursuant

to section 7411 or 7412 of this title [emission standards for new and existing stationary sources]." §7479(3).

40 CFR §51.166(b)(12) (2002) (repeating statutory definition). Alaska's SIP contains provisions that track the statutory BACT requirement and definition. 18 Alaska Admin. Code §§50.310(d)(3) and 50.990(13) (2003). The State, with slightly variant terminology, defines BACT as "the emission limitation that represents the maximum reduction achievable for each regulated air contaminant, taking into account energy, environmental and economic impacts, and other costs." §50.990(13). Under the federal Act, a limited class of sources must gain advance EPA approval for the BACT prescribed in the permit. 42 U. S. C. §7475(a)(8).

CAA also provides that a PSD permit may issue only if a source "will not cause, or contribute to, air pollution in excess of any . . . maximum allowable increase or maximum allowable concentration for any pollutant" or any NAAQS. §7475(a)(3). Congress left to the Agency the determination of most maximum allowable increases, or "increments," in pollutants. EPA regulations have defined increments for nitrogen oxides. 40 CFR §51.166(c) (2002). Typically, to demonstrate that increments will not be exceeded, applicants use mathematical models of pollutant plumes, their behavior, and their dispersion. Westbrook, Air Dispersion Models: Tools to Assess Impacts from Pollution Sources, 13 Natural Resources & Env. 546, 547–548 (1999).

Among measures EPA may take to ensure compliance with the PSD program, two have special relevance here. The first prescription, §113(a)(5) of the Act, provides that "[w]henever, on the basis of any available information, [EPA] finds that a State is not acting in compliance with any requirement or prohibition of the chapter relating to the construction of new sources or the modification of existing sources," 42 U. S. C. §7413(a)(5), EPA may "issue an order prohibiting the construction or modification of any major stationary source in any area to which such requirement ap-

plies," § 7413(a)(5)(A).[4]  The second measure, § 167 of the Act, trains on enforcement of the PSD program; it requires EPA to "take such measures, including issuance of an order, or seeking injunctive relief, as necessary to prevent the construction or modification of a major emitting facility which does not conform to the [PSD] requirements."  § 7477.

### B

Teck Cominco Alaska Inc. (Cominco) operates a zinc concentrate mine, the Red Dog Mine, in northwest Alaska approximately 100 miles north of the Arctic Circle and close to the native Alaskan villages of Kivalina and Noatak.  App. to Pet. for Cert. 3a; Brief for Petitioner 8; Brief for Respondents 4.  The mine is the region's largest private employer. Brief for Petitioner 9.  It supplies a quarter of the area's wage base.  *Ibid.*  Cominco leases the land from the NANA Regional Corporation, an Alaskan corporation formed pursuant to the Alaska Native Claims Settlement Act, 85 Stat. 688, as amended, 43 U. S. C. § 1601 *et seq.*  Brief for NANA Regional Corporation, Inc., as *Amicus Curiae* 1–2, 4.

In 1988, Cominco obtained authorization to operate the mine, a "major emitting facility" under the Act and Alaska's SIP.  App. 106.  The mine's PSD permit authorized five 5,000 kilowatt Wartsila diesel electric generators, MG–1 through MG–5, subject to operating restrictions; two of the five generators were permitted to operate only in standby status.  *Ibid.*  Petitioner Alaska Department of Environmental Conservation (ADEC) issued a second PSD permit in 1994 allowing addition of a sixth full-time generator (MG–6), removing standby status from MG–2, and imposing a new

---

[4] As enacted in 1977, § 113(a)(5) extended only to solid waste combustion and sources in nonattainment areas.  See Title I, § 111(a), 91 Stat. 685. Congress extended § 113(a)(5) in 1990 amendments to the Act to cover attainment areas, and thus to encompass enforcement of PSD permitting requirements.  Title VII, 104 Stat. 2672.

operational cap that allowed all but one generator to run full time. *Ibid.*

In 1996, Cominco initiated a project, with funding from the State, to expand zinc production by 40%. Brief for Petitioner 10; Reply Brief for Petitioner 11, n. 9. Anticipating that the project would increase nitrogen oxide emissions by more than 40 tons per year, see *supra,* at 472, Cominco applied to ADEC for a PSD permit to allow, *inter alia,* increased electricity generation by its standby generator, MG–5. App. 107–108; App. to Pet. for Cert. 33a. On March 3, 1999, ADEC preliminarily proposed as BACT for MG–5 the emission control technology known as selective catalytic reduction (SCR),[5] which reduces nitrogen oxide emissions by 90%. App. 72, 108. In response, Cominco amended its application to add a seventh generator, MG–17, and to propose as BACT an alternative control technology—Low NOx[6]—that achieves a 30% reduction in nitrogen oxide pollutants. Brief for Respondents 5, and n. 1; App. 84.

On May 4, 1999, ADEC, in conjunction with Cominco's representative, issued a first draft PSD permit and preliminary technical analysis report that concluded Low NOx was BACT for MG–5 and MG–17. *Id.,* at 55–95. To determine BACT, ADEC employed EPA's recommended top-down methodology, *id.,* at 61:

> "In brief, the top-down process provides that all available control technologies be ranked in descending order of control effectiveness. The PSD applicant first examines the most stringent—or 'top'—alternative. That al-

---

[5] SCR requires injections of "ammonia or urea into the exhaust before the exhaust enters a catalyst bed made with vanadium, titanium, or platinum. The reduction reaction occurs when the flue gas passes over the catalyst bed where the NOx and ammonia combine to become nitrogen, oxygen, and water . . . ." App. 71.

[6] In Low NOx, changes are made to a generator to improve fuel atomization and modify the combustion space to enhance the mixing of air and fuel. *Id.,* at 75.

ternative is established as BACT unless the applicant demonstrates, and the permitting authority in its informed judgment agrees, that technical considerations, or energy, environmental, or economic impacts justify a conclusion that the most stringent technology is not 'achievable' in that case. If the most stringent technology is eliminated in this fashion, then the next most stringent alternative is considered, and so on." EPA, New Source Review Workshop Manual B.2 (Draft Oct. 1990) (hereinafter New Source Review Manual); App. 61–62.[7]

Applying top-down methodology, ADEC first homed in on SCR as BACT for MG–5, and the new generator, MG–17. "[W]ith an estimated reduction of 90%," ADEC stated, SCR "is the most stringent" technology. *Id.*, at 79. Finding SCR "technically and economically feasible," *id.*, at 65, ADEC characterized as "overstated" Cominco's cost estimate of $5,643 per ton of nitrogen oxide removed by SCR, *id.*, at 113. Using Cominco's data, ADEC reached a cost estimate running between $1,586 and $2,279 per ton. *Id.*, at 83. Costs in that range, ADEC observed, "are well within what ADEC and EPA conside[r] economically feasible." *Id.*, at 84. Responding to Cominco's comments on the preliminary permit, engineering staff in ADEC's Air Permits Program pointed out that, according to information Cominco provided to ADEC, "SCR has been installed on similar diesel-fired engines throughout the world." *Id.*, at 102.

Despite its staff's clear view "that SCR (the most effective individual technology) [was] technologically, environmentally, and economically feasible for the Red Dog power plant engines," *id.*, at 103–104, ADEC endorsed the alternative prof-

---

[7] Nothing in the Act or its implementing regulations mandates top-down analysis. See 42 U. S. C. § 7479(3); 40 CFR § 52.21(j) (2002). EPA represents that permitting authorities "commonly" use top-down methodology. Brief for Respondents 3.

fered by Cominco. To achieve nitrogen oxide emission reductions commensurate with SCR's 90% impact, Cominco proposed fitting the new generator MG–17 and the six existing generators with Low NOx. *Ibid.*[8] Cominco asserted that it could lower net emissions by 396 tons per year if it fitted all seven generators with Low NOx rather than fitting two (MG–5 and MG–17) with SCR and choosing one of them as the standby unit. *Id.,* at 87. Cominco's proposal hinged on the "assumption . . . that under typical operating conditions one or more engines will not be running due to maintenance of standby-generation capacity." *Ibid.* If all seven generators ran continuously, however, Cominco's alternative would increase emissions by 79 tons per year. *Ibid.* Accepting Cominco's submission, ADEC stated that Cominco's Low NOx solution "achieve[d] a similar maximum NOx reduction as the most stringent controls; [could] potentially result in a greater NOx reduction; and is logistically and economically less onerous to Cominco." *Id.,* at 87–88.

On the final day of the public comment period, June 2, 1999, the United States Department of the Interior, National Parks Service (NPS), submitted comments to ADEC. App. to Pet. for Cert. 33a; App. 97, 108. NPS objected to the projected offset of new emissions from MG–5 and MG–17 against emissions from other existing generators that were not subject to BACT. Letter from John Notar, NPS Air *Resources Division, to Jim Baumgartner,* ADEC (June 2, 1999). Such an offset, NPS commented, "is neither allowed by BACT, nor achieves the degree of reduction that would result if all the generators that are subject to BACT were equipped with SCR." *Id.,* at 3. NPS further observed that the proposed production-increase project would remove operating restrictions that the 1994 PSD permit had placed on four of the existing generators—MG–1, MG–3, MG–4,

---

[8] Two generators already were fitted with a technology called Fuel Injection Timing Retard that results in a 20% to 30% reduction in nitrogen oxide emissions. App. 75–76, 86.

and MG–5. App. to Pet. for Cert. 34a. Due to that alteration, NPS urged, those generators, too, became part of the production-expansion project and would be subject to the BACT requirement. *Ibid.*

Following NPS' lead, EPA wrote to ADEC on July 29, 1999, commenting: "Although ADEC states in its analysis that [SCR], the most stringent level of control, is economically and technologically feasible, ADEC did not propose to require SCR. . . . [O]nce it is determined that an emission unit is subject to BACT, the PSD program does not allow the imposition of a limit that is less stringent than BACT." App. 96–97. A permitting authority, EPA agreed with NPS, could not offset new emissions "by imposing new controls on other emission units" that were not subject to BACT. *Id.*, at 97. New emissions could be offset only against reduced emissions from sources covered by the same BACT authorization. *Id.*, at 285–286. EPA further agreed with NPS that, based on the existing information, BACT would be required for MG–1, MG–3, MG–4, and MG–5. *Id.*, at 97.

After receiving EPA comments, ADEC issued a second draft PSD permit and technical analysis report on September 1, 1999, again finding Low NOx to be BACT for MG–17. *Id.*, at 105–117. Abandoning the emissions-offsetting justification advanced in the May 4 draft permit, ADEC agreed with NPS and EPA that "emission reductions from sources that were not part of the permit action," here MG–1, MG–2, MG–3, MG–4, MG–5, and MG–6, could not be considered in determining BACT for MG–17. *Id.*, at 111; *id.*, at 199 (same).[9]

---

[9] Rather than subject MG–1, MG–3, MG–4, and MG–5 to BACT, ADEC and Cominco "agreed to permit conditions that would require low NOx controls on MG–1, MG–3, MG–4, and MG–5, and emission limits that reflect the previous 'bubbled' limits. Under this approach, the permit would result in no increase in actual or allowable emissions from any of these engines and the installation of BACT would not be necessary for these four

ADEC conceded that, lacking data from Cominco, it had made "no judgment . . . as to the impact of . . . [SCR] on the operation, profitability, and competitiveness of the Red Dog Mine." *Id.,* at 116. Contradicting its May 1999 conclusion that SCR was "technically and economically feasible," see *supra,* at 476, ADEC found in September 1999 that SCR imposed "a disproportionate cost" on the mine. App. 116. ADEC concluded, on a "cursory review," that requiring SCR for a rural Alaska utility would lead to a 20% price increase, and that in comparison with other BACT technologies, SCR came at a "significantly higher" cost. *Ibid.* No economic basis for a comparison between the mine and a rural utility appeared in ADEC's technical analysis.

EPA protested the revised permit. In a September 15, 1999, letter, the Agency stated: "Cominco has not adequately demonstrated any site-specific factors to support their claim that the installation of [SCR] is economically infeasible at the Red Dog Mine. Therefore, elimination of SCR as BACT based on cost-effectiveness grounds is not supported by the record and is clearly erroneous." *Id.,* at 127; see *id.,* at 138 (ADEC's record does not support the departure from ADEC's initial view that the costs for SCR were economically feasible).

To justify the September 1, 1999, permit, EPA suggested, ADEC could "include an analysis of whether requiring Cominco to install and operate [SCR] would have any adverse economic impacts upon Cominco specifically." *Id.,* at 127. Stating that such an inquiry was unnecessary and expressing "concerns related to confidentiality," Cominco declined to submit financial data. *Id.,* at 134. In this regard, Cominco simply asserted, without detail, that the company's "overall debt remains quite high" despite continuing profits. *Id.,* at

units." *Id.,* at 149. EPA found no cause to question this ADEC-Cominco agreement. *Ibid.*

134–135. Cominco also invoked the need for "[i]ndustrial development in rural Alaska." *Id.*, at 135.

On December 10, 1999, ADEC issued the final permit and technical analysis report. Once again, ADEC approved Low NOx as BACT for MG–17 "[t]o support Cominco's Red Dog Mine Production Rate Increase Project, and its contributions to the region." *Id.*, at 208. ADEC did not include the economic analysis EPA had suggested. *Id.*, at 152–246. Indeed, ADEC conceded again that it had made "no judgment . . . as to the impact of . . . [SCR's] cost on the operation, profitability, and competitiveness of the Red Dog Mine." *Id.*, at 207. Nonetheless, ADEC advanced, as cause for its decision, SCR's adverse effect on the mine's "unique and continuing impact on the economic diversity of th[e] region" and on the venture's "world competitiveness." *Id.*, at 208. ADEC did not explain how its inferences of adverse effects on the region's economy or the mine's "world competitiveness" could be made without financial information showing SCR's impact on the "operation, profitability, and competitiveness" of the mine. *Id.*, at 207, 299. Instead, ADEC reiterated its rural Alaska utility analogy, and again compared SCR's cost to the costs of other, less stringent, control technologies. *Id.*, at 205–207.

The same day, December 10, 1999, EPA issued an order to ADEC, under §§ 113(a)(5) and 167 of the Act, 42 U. S. C. §§ 7413(a)(5) and 7477, prohibiting ADEC from issuing a PSD permit to Cominco "unless ADEC satisfactorily documents why SCR is not BACT for the Wartsila diesel generator [MG–17]." App. to Pet. for Cert. 36a. In the letter accompanying the order, the Agency stated that "ADEC's own analysis supports the determination that BACT is [SCR], and that ADEC's decision in the proposed permit therefore is both arbitrary and erroneous." App. 149.

On February 8, 2000, EPA, again invoking its authority under §§ 113(a)(5) and 167 of the Act, issued a second order,

this time prohibiting Cominco from beginning "construction or modification activities at the Red Dog mine." App. to Pet. for Cert. 49a. A third order, issued on March 7, 2000, superseding and vacating the February 8 order, generally prohibited Cominco from acting on ADEC's December 10 PSD permit but allowed limited summer construction. *Id.,* at 62a–64a. On April 25, 2000, EPA withdrew its December 10 order. App. 300; App. to Pet. for Cert. 6a. Once ADEC issued the permit, EPA explained, that order lacked utility. On July 16, 2003, ADEC granted Cominco a PSD permit to construct MG–17 with SCR as BACT. Letter from Theodore B. Olson, Solicitor General, to William K. Suter, Clerk of the Court (Aug. 21, 2003). Under the July 16, 2003, permit, SCR ceases to be BACT "if and when the case currently pending before the Supreme Court of the United States of America is decided in favor of the State of Alaska." ADEC, Air Quality Control Construction Permit, Final Technical Analysis Report, Permit No. 9932–AC005, Revision 2, p. 7.

The day EPA issued its first order against Cominco, February 8, 2000, ADEC and Cominco petitioned the Court of Appeals for the Ninth Circuit for review of EPA's orders. App. 11. The Agency initially moved to dismiss, urging that the Court of Appeals lacked subject-matter jurisdiction. In an order released March 27, 2001, the Ninth Circuit concluded that it had adjudicatory authority pursuant to 42 U. S. C. § 7607(b)(1), which lodges jurisdiction over challenges to "any . . . final [EPA] action" in the Courts of Appeals. *Alaska* v. *United States EPA,* 244 F. 3d 748, 750–751.[10]

The Court of Appeals resolved the merits in a judgment released July 30, 2002. 298 F. 3d 814 (CA9). It held that

---

[10] At oral argument, counsel for EPA confirmed that the Agency no longer questions the Court of Appeals' adjudicatory authority, satisfied that the finality requirement was met because the stop-construction order imposed "new legal obligations on Cominco." Tr. of Oral Arg. 43–44 (punctuation omitted).

EPA had authority under §§ 113(a)(5) and 167 to issue the contested orders, and that the Agency had properly exercised its discretion in doing so. *Id.*, at 820–823. Concerning EPA's authority under §§ 113(a)(5) and 167, the Court of Appeals observed first that "the question presented is what requirements the *state* must meet" under the Act to issue a PSD permit, not what the correct BACT might be. *Id.*, at 821 (emphasis in original). Concluding that EPA had "authority to determine the reasonableness or adequacy of the state's justification for its decision," the Court of Appeals emphasized that the "provision of a reasoned justification" by a permitting authority is undeniably a "requirement" of the Act. *Ibid.* EPA had properly exercised its discretion in issuing the three orders, the Ninth Circuit ultimately determined, because (1) Cominco failed to "demonstrat[e] that SCR was economically infeasible," and (2) "ADEC failed to provide a reasoned justification for its elimination of SCR as a control option." *Id.*, at 823. We granted certiorari, 537 U. S. 1186 (2003), to resolve an important question of federal law, *i. e.*, the scope of EPA's authority under §§ 113(a)(5) and 167, and now affirm the Ninth Circuit's judgment.

## II

ADEC contested EPA's orders under 42 U. S. C. § 7607 (b)(1), which renders reviewable in the appropriate federal court of appeals any EPA "final action." Before the Ninth Circuit, EPA unsuccessfully urged that its orders were "interlocutory," and therefore unreviewable in court unless and until EPA chose to commence an enforcement action.[11] A preenforcement contest could be maintained in the Court of Appeals under § 7607(b)(1), the Ninth Circuit held, for in the circumstances presented, EPA's actions had the requisite finality.

---

[11] Such an action would lie in district court, under 42 U. S. C. § 7413(b).

It was undisputed, the Court of Appeals observed, that EPA had spoken its "'last word'" on whether ADEC had adequately justified its conclusion that Low NOx was the best available control technology for the MG–17 generator. 244 F. 3d, at 750. Further, EPA's orders effectively halted construction of the MG–17 generator, for Cominco would risk civil and criminal penalties if it defied a valid EPA directive.

In this Court, EPA agrees with the Ninth Circuit's finality determination. See Brief for Respondents 16–20; Tr. of Oral Arg. 43–44. We are satisfied that the Court of Appeals correctly applied the guides we set out in *Bennett* v. *Spear*, 520 U. S. 154, 177–178 (1997) (to be "final," agency action must "mark the 'consummation' of the agency's decisionmaking process," and must either determine "rights or obligations" or occasion "legal consequences" (some internal quotation marks omitted)). As the Court of Appeals stated, EPA had "asserted its final position on the factual circumstances" underpinning the Agency's orders, 244 F. 3d, at 750, and if EPA's orders survived judicial review, Cominco could not escape the practical and legal consequences (lost costs and vulnerability to penalties) of any ADEC-permitted construction Cominco endeavored, *ibid.*

No question has been raised here, we note, about the adequacy of EPA's preorder procedures under the Due Process Clause or the Administrative Procedure Act. Cf. *Vermont Yankee Nuclear Power Corp.* v. *Natural Resources Defense Council, Inc.*, 435 U. S. 519, 544 (1978) (agencies have authority to "fashion their own rules of procedure," even when a statute does not specify what process to use). Furthermore, in response to ADEC's initial contention that the record was incomplete, the Ninth Circuit gave EPA an opportunity to supplement the record, and thereafter obtained from all parties agreement "that the record as it stood was adequate to resolve [ADEC's review petition]." 298 F. 3d, at 818.

## III

### A

Centrally at issue in this case is the question whether EPA's oversight role, described by Congress in CAA §§ 113(a)(5) and 167, see *supra*, at 473–474, extends to ensuring that a state permitting authority's BACT determination is reasonable in light of the statutory guides. Sections 113(a)(5) and 167 lodge in the Agency encompassing supervisory responsibility over the construction and modification of pollutant emitting facilities in areas covered by the PSD program. 42 U. S. C. §§ 7413(a)(5) and 7477. In notably capacious terms, Congress armed EPA with authority to issue orders stopping construction when "a State is not acting in compliance with any [CAA] requirement or prohibition . . . relating to the construction of new sources or the modification of existing sources," § 7413(a)(5), or when "construction or modification of a major emitting facility . . . does not conform to the requirements of [the PSD program]," § 7477.

The federal Act enumerates several "[p]reconstruction requirements" for the PSD program. § 7475. Absent these, "[n]o major emitting facility . . . may be constructed." *Ibid.* One express preconstruction requirement is inclusion of a BACT determination in a facility's PSD permit. §§ 7475(a)(1) and (4). As earlier set out, see *supra*, at 472, the Act defines BACT as "an emission limitation based on the maximum degree of reduction of [a] pollutant . . . which the permitting authority, on a case-by-case basis, taking into account energy, environmental, and economic impacts and other costs, determines is achievable for [a] facility." § 7479(3). Under this formulation, the permitting authority, ADEC here, exercises primary or initial responsibility for identifying BACT in line with the Act's definition of that term.

All parties agree that one of the "many requirements in the PSD provisions that the EPA may enforce" is "that a

[PSD] permit contain a BACT limitation." Brief for Petitioner 34; see *id.*, at 22, 25 (same). See also Brief for Respondents 23. It is therefore undisputed that the Agency may issue an order to stop a facility's construction if a PSD permit contains no BACT designation.

EPA reads the Act's definition of BACT, together with CAA's explicit listing of BACT as a "[p]reconstruction requiremen[t]," to mandate not simply *a* BACT designation, but a determination of BACT faithful to the statute's definition. In keeping with the broad oversight role §§ 113(a)(5) and 167 vest in EPA, the Agency maintains, it may review permits to ensure that a State's BACT determination is reasonably moored to the Act's provisions. See *id.*, at 24. We hold, as elaborated below, that the Agency has rationally construed the Act's text and that EPA's construction warrants our respect and approbation.

BACT's statutory definition requires selection of an emission control technology that results in the "maximum" reduction of a pollutant "achievable for [a] facility" in view of "energy, environmental, and economic impacts and other costs." 42 U. S. C. § 7479(3). This instruction, EPA submits, cabins state permitting authorities' discretion by granting only "authority to make *reasonable* BACT determinations," Brief for Respondents 27 (emphasis in original), *i. e.*, decisions made with fidelity to the Act's purpose "to insure that economic growth will occur in a manner consistent with the preservation of existing clean air resources," 42 U. S. C. § 7470(3). Noting that state permitting authorities' statutory discretion is constrained by CAA's strong, normative terms "maximum" and "achievable," § 7479(3),[12] EPA reads §§ 113(a)(5)

_____

[12] Formulations similar to the BACT definition's "maximum degree of [pollutant] reduction . . . achievable" appear in the Act's standards for new sources in nonattainment areas, 42 U. S. C. §§ 7501(3) and 7503(a)(2) ("lowest achievable emission rate" (internal quotation marks omitted)), and its technology-based standard for hazardous emissions, § 7412(d)(2) ("maximum degree of reduction . . . achievable").

and 167 to empower the federal Agency to check a state agency's unreasonably lax BACT designation. See Brief for Respondents 27.

EPA stresses Congress' reason for enacting the PSD program—to prevent significant deterioration of air quality in clean-air areas within a State and in neighboring States. §§ 7470(3), (4); see *id.*, at 33. That aim, EPA urges, is unlikely to be realized absent an EPA surveillance role that extends to BACT determinations. The Agency notes in this regard a House Report observation:

> "Without national guidelines for the prevention of significant deterioration a State deciding to protect its clean air resources will face a double threat. The prospect is very real that such a State would lose existing industrial plants to more permissive States. But additionally the State will likely become the target of 'economic-environmental blackmail' from new industrial plants that will play one State off against another with threats to locate in whichever State adopts the most permissive pollution controls." H. R. Rep. No. 95–294, p. 134 (1977).

The House Report further observed that "a community that sets and enforces strict standards may still find its air polluted from sources in another community or another State." *Id.*, at 135 (quoting 116 Cong. Rec. 32909 (1970)). Federal Agency surveillance of a State's BACT designation is needed, EPA asserts, to restrain the interjurisdictional pressures to which Congress was alert. See Brief for Respondents 33–34, 43; Brief for Vermont et al. as *Amici Curiae* 12 ("If EPA has authority to ensure a reasonable level of consistency among BACT determinations nationwide, then every State can feel more confident about maintaining stringent standards without fear of losing its current industry or alienating prospective industry.").

The CAA construction EPA advances in this litigation is reflected in interpretive guides the Agency has several times published. See App. 268–269 (1983 EPA PSD guidance memorandum noting the Agency's "oversight function"); *id.*, at 274 (1988 EPA guidance memorandum stating EPA may find a BACT determination deficient if it is "not based on a reasoned analysis"); *id.*, at 281–282 (1993 guidance memorandum stating that "EPA acts to ensure that the state exercises its discretion within the bounds of the law" (internal quotation marks omitted); as to BACT, EPA will not intervene if the state agency has given "a reasoned justification for the basis of its decision" (internal quotation marks omitted)). See also Approval and Promulgation of Air Quality Implementation Plans; Commonwealth of Virginia—Prevention of Significant Deterioration Program, 63 Fed. Reg. 13797 (1998) (EPA will "review whether any determination by the permitting authority was made on reasonable grounds properly supported on the record, described in enforceable terms, and consistent with all applicable requirements"). We "normally accord particular deference to an agency interpretation of 'longstanding' duration," *Barnhart* v. *Walton*, 535 U. S. 212, 220 (2002) (quoting *North Haven Bd. of Ed.* v. *Bell*, 456 U. S. 512, 522, n. 12 (1982)), recognizing that "well-reasoned views" of an expert administrator rest on "'a body of experience and informed judgment to which courts and litigants may properly resort for guidance,'" *Bragdon* v. *Abbott*, 524 U. S. 624, 642 (1998) (quoting *Skidmore* v. *Swift & Co.*, 323 U. S. 134, 139–140 (1944)).

We have previously accorded dispositive effect to EPA's interpretation of an ambiguous CAA provision. See *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837, 865–866 (1984); *Union Elec.*, 427 U. S., at 256. The Agency's interpretation in this case, presented in internal guidance memoranda, however, does not qualify for the dispositive force described in *Chevron*. See *Christensen* v. *Harris County*, 529 U. S. 576, 587 (2000) ("Interpretations

such as those in . . . policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law—do not warrant *Chevron*-style deference."); accord *United States* v. *Mead Corp.*, 533 U. S. 218, 234 (2001). Cogent "administrative interpretations . . . not [the] products of formal rulemaking . . . nevertheless warrant respect." *Washington State Dept. of Social and Health Servs.* v. *Guardianship Estate of Keffeler*, 537 U. S. 371, 385 (2003). We accord EPA's reading of the relevant statutory provisions, §§ 7413(a)(5), 7470(3), 7470(4), 7475(a)(4), 7477, and 7479(3), that measure of respect.

B

ADEC assails the Agency's construction of the Act on several grounds. Its arguments do not persuade us to reject as impermissible EPA's longstanding, consistently maintained interpretation.

ADEC argues that the statutory definition of BACT, § 7479(3), unambiguously assigns to "the permitting authority" alone determination of the control technology qualifying as "best available." Brief for Petitioner 21–26. Because the Act places responsibility for determining BACT with "the permitting authority," ADEC urges, CAA excludes federal Agency surveillance reaching the substance of the BACT decision. *Id.*, at 22–25. EPA's enforcement role, ADEC maintains, is restricted to the requirement "that the permit contain a BACT limitation." *Id.*, at 34.

Understandably, Congress entrusted state permitting authorities with initial responsibility to make BACT determinations "case-by-case." § 7479(3). A state agency, no doubt, is best positioned to adjust for local differences in raw materials or plant configurations, differences that might make a technology "unavailable" in a particular area. But the fact that the relevant statutory guides—"maximum" pollution reduction, considerations of energy, environmental, and economic impacts—may not yield a "single, objectively 'correct' BACT determination," *id.*, at 23, surely does not

signify that there can be no *unreasonable* determinations. Nor does Congress' sensitivity to site-specific factors necessarily imply a design to preclude in this context meaningful EPA oversight under §§ 113(a)(5) and 167. EPA claims no prerogative to designate the correct BACT; the Agency asserts only the authority to guard against unreasonable designations. See 298 F. 3d, at 821 ("the question presented is what requirements the *state* must meet," not what final substantive decision the State must make (emphasis in original)).[13]

Under ADEC's interpretation, EPA properly inquires whether a BACT determination appears in a PSD permit,

---

[13] The dissent admonishes that "a statute is to be read as a whole." *Post*, at 504 (quoting *King* v. *St. Vincent's Hospital*, 502 U. S. 215, 221 (1991)). We give that unexceptional principle effect by attending both to the unequivocal grant of supervisory authority to EPA in §§ 113(a)(5) and 167, and to the statutory control on permitting authorities' discretion contained in the BACT definition, 42 U. S. C. § 7479(3). It is, moreover, "a cardinal principle of statutory construction' that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." *TRW Inc.* v. *Andrews*, 534 U. S. 19, 31 (2001) (quoting *Duncan* v. *Walker*, 533 U. S. 167, 174 (2001)). The Act instructs permitting authorities to identify the "best," "maximum" emission reduction technique, taking account of costs. 42 U. S. C. § 7479(3). The dissent does not explain how that instruction can be construed as something other than a constraint on permitting authorities' discretion. *Ultimately, the dissent recognizes the essential* statutory requirement: selection of "the technology that can *best* reduce pollution within practical constraints." *Post*, at 505 (emphasis added).

Nor do we find enlightening Congress' inclusion of the word "determines" in the BACT definition. *Post*, at 503–504. Even under the dissent's view of the Act, state permitting authorities' BACT determinations are not "conclusiv[e] and authoritativ[e]." *Post*, at 504 (internal quotation marks and citation omitted). As the dissent develops at length, review of such BACT determinations may be sought in state court. *Post*, at 509–512; Alaska Stat. § 44.62.560 (2002). And EPA actions, of course, are subject to "the process of judicial review," *post*, at 503, Congress empowered federal courts to provide, here in 42 U. S. C. § 7607(b)(1). See *supra*, at 482–483.

Brief for Petitioner 34, but not whether that BACT determination "was made on reasonable grounds properly supported on the record," 63 Fed. Reg., at 13797. Congress, however, vested EPA with explicit and sweeping authority to enforce CAA "requirements" relating to the construction and modification of sources under the PSD program, including BACT. We fail to see why Congress, having expressly endorsed an expansive surveillance role for EPA in two independent CAA provisions, would then implicitly preclude the Agency from verifying substantive compliance with the BACT provisions and, instead, limit EPA's superintendence to the insubstantial question whether the state permitting authority had uttered the key words "BACT."

We emphasize, however, that EPA's rendition of the Act's less than crystalline text leaves the "permitting authority" considerable leeway. The Agency acknowledges "the need to accord appropriate deference" to States' BACT designations, Brief for Respondents 43, and disclaims any intention to "'second guess' state decisions," 63 Fed. Reg., at 13797. Only when a state agency's BACT determination is "not based on a reasoned analysis," App. 274, may EPA step in to ensure that the statutory requirements are honored.[14] EPA

---

[14] According to the Agency, "[i]t has proven to be relatively rare that a state agency has put EPA in the position of having to exercise [its] authority," noting that only two other reported judicial decisions concern EPA orders occasioned by States' faulty BACT determinations. Brief for Respondents 30, and n. 9 (citing *Allsteel, Inc.* v. *EPA*, 25 F. 3d 312 (CA6 1994), and *Solar Turbines Inc.* v. *Seif*, 879 F. 2d 1073 (CA3 1989)). EPA's restrained and moderate use of its authority hardly supports the dissent's speculation that the federal Agency will "displac[e]" or "degrad[e]" state agencies or relegate them to the performance of "ministerial" functions. *Post*, at 516, 518. Nor has EPA ever asserted authority to override a state-court judgment. Cf. *post*, at 511. Preclusion principles, we note in this regard, unquestionably do apply against the United States, its agencies and officers. See, *e. g., Montana* v. *United States*, 440 U.S. 147 (1979).

adhered to that limited role here, explaining why ADEC's BACT determination was "arbitrary" and contrary to ADEC's own findings. *Id.*, at 149–150. EPA's limited but vital role in enforcing BACT is consistent with a scheme that "places primary responsibilities and authority with the States, backed by the Federal Government." S. Rep. No. 95–127, p. 29.

ADEC also points to 42 U. S. C. § 7475(a)(8), a provision of the Act expressly requiring, in a limited category of cases, EPA approval of a state permitting authority's BACT determination before a facility may be constructed. See Brief for Petitioner 25; Reply Brief for Petitioner 6. Had Congress intended EPA superintendence of BACT determinations, ADEC urges, Congress would have said so expressly by mandating Agency approval of all, not merely some, BACT determinations. Brief for Petitioner 25–26. ADEC's argument overlooks the obvious difference between a statutory *requirement, e. g.,* § 7475(a)(8), and a statutory *authorization.* Sections 113(a)(5) and 167 sensibly do not require EPA approval of all state BACT determinations, they simply authorize EPA to act in the unusual case in which a state permitting authority has determined BACT arbitrarily. EPA recognizes that its authorization to issue a stop order may be exercised only when a state permitting authority's decision is unreasonable; in contrast, a required approval may be withheld if EPA would come to a different determination on the merits. See, *e. g.,* 57 Fed. Reg. 28095 (1992) ("EPA acknowledges that states have the primary role in administering and enforcing the various components of the PSD program. States have been largely successful in this effort, and EPA's involvement in interpretative and enforcement issues is limited to only a small number of cases.").

Even if the Act imposes a requirement of reasoned justification for a BACT determination, ADEC ultimately argues, such a requirement may be enforced only through state ad-

ministrative and judicial processes. Brief for Petitioner 34–38.[15] State review of BACT decisions, according to ADEC, allows development of an adequate factual record, properly imposes the burden of persuasion on EPA when it challenges a State's BACT determination, and promotes certainty. *Id.*, at 36–37. Unless EPA review of BACT determinations is channeled into state administrative and judicial forums, ADEC suggests, "there is nothing to prevent the EPA from invalidating a BACT determination at any time—months, even years, after a permit has been issued." *Id.*, at 35.

It would be unusual, to say the least, for Congress to remit a federal agency enforcing federal law solely to state court. We decline to read such an uncommon regime into the Act's silence. EPA, the expert federal agency charged with enforcing the Act, has interpreted the BACT provisions and its own §§ 113(a)(5) and 167 enforcement powers not to require recourse to state processes before stopping a facility's con-

---

[15] From the availability of state-court judicial review, the dissent concludes, it necessarily "follows that EPA . . . must take the same procedural steps," of filing suit in state court, as any other person or entity seeking to challenge the issuance of a PSD permit. *Post*, at 509. Interpreted otherwise, the dissent asserts, the Act contains a "loophole" that allows an EPA "end run around the State's process." *Post*, at 511. In designing the Act, however, Congress often gave EPA a choice of enforcement measures. For example, EPA has three options to address a failure to comply with new source requirements. Compare 42 U. S. C. § 7413(a)(5)(A) (EPA may "issue an order prohibiting the construction or modification of any major stationary source") with § 7413(a)(5)(B) (EPA may "issue an administrative penalty order") and § 7413(a)(5)(C) (EPA may "bring a civil action"). Other sections of the Act provide EPA with similar options. See, *e. g.*, §§ 7413(a)(1)–(3). Following the dissent's logic, EPA's authority to bring a civil action would rule out, as a "loophole," its authority to issue a stop-construction order.

Moreover, the existence of concurrent authority is hardly at odds with the Act. As ADEC itself concedes, EPA can issue a checking order if a PSD permit lacks a BACT determination, Brief for Petitioner 34, even if state-court jurisdiction could be invoked instead.

struction. See *supra,* at 485–488. That rational interpretation, we agree, is surely permissible.[16]

Nor are we persuaded by ADEC's practical concerns. We see no reason to conclude that an appropriate record generally cannot be developed to allow informed federal-court review when EPA disputes a BACT decision's reasonableness. ADEC contends that, in this very case, "the State's BACT determination was reviewed by the Ninth Circuit on an incomplete record." Brief for Petitioner 37. ADEC, however, offers no particulars to back up its assertion that the Court of Appeals proceeded on an inadequate evidentiary record. We note again that the Ninth Circuit ordered EPA to submit a complete administrative record. 298 F. 3d, at 818. After the Agency declared that the record was complete, "all the parties effectively agreed that the record as it stood was adequate to resolve the issues on appeal." *Ibid.*

As to the burdens of production and persuasion, nothing in the Act suggests that EPA gains a proof-related tactical advantage by issuing a stop-construction order instead of seeking relief through a civil action. But cf. *post,* at 510 (EPA authority to issue stop-construction orders creates "the anomaly of shifting the burden of pleading and of initiating litigation from EPA to the State"). Correspondingly, nothing in our decision today invites or permits EPA to achieve an unfair advantage through its choice of litigation forum. In granting EPA a choice between initiating a civil action and exercising its stop-construction-order authority, see *supra,* at 473–474, 492, n. 15, Congress nowhere suggested that the allocation of proof burdens would differ depending upon which enforcement route EPA selected. The

---

[16] Experience, we have already noted, see *supra,* at 490, n. 14, affords no grounding for the dissent's predictions that EPA oversight, which is undeniably subject to federal-court review, will "rewor[k] . . . the balance between State and Federal Governments" and threaten state courts' independence. *Post,* at 511–512.

point ought not to be left in doubt. Accordingly, we hold that in either an EPA-initiated civil action or a challenge to an EPA stop-construction order filed in state or federal court, the production and persuasion burdens remain with EPA and the underlying question a reviewing court resolves remains the same: Whether the state agency's BACT determination was reasonable, in light of the statutory guides and the state administrative record. See *supra*, at 485–486, 491.[17]

The Ninth Circuit's review of EPA's order is in keeping with our holding that EPA may not reduce the burden it must carry by electing to invoke its stop-construction-order authority. Specifically, the Court of Appeals rested its judgment on what EPA showed from ADEC's own report: "(1) Cominco failed to meet its burden of demonstrating [to ADEC] that SCR was economically infeasible; and (2) ADEC failed to provide a reasoned justification for its elimination of SCR as a control option." 298 F. 3d, at 823. EPA's conclusions, and the basis for them, support the Court of Appeals' determination that the federal Agency's grounds for issuing the orders under review were not "arbitrar[y] and capriciou[s]." *Ibid.* Our own analysis, *infra*, at 497–502, similarly hinges on the question whether ADEC's BACT determination was a reasonable one. Our analysis would have

---

[17] "[L]ooking for the burden of pleading is not a foolproof guide to the allocation of the burdens of proof. The latter burdens do not invariably follow the pleadings." 2 J. Strong, McCormick on Evidence § 337, pp. 411–412 (5th ed. 1999). No "single principle or rule . . . solve[s] all cases and afford[s] a general test for ascertaining the incidence" of proof burdens. 9 J. Wigmore, Evidence § 2486, p. 288 (J. Chadbourn rev. ed. 1981) (emphasis deleted). "[I]n a case of first impression," which we address today, "reference to which party has pleaded a fact is no help at all." 2 McCormick, *supra*, § 337, at 412. Among other considerations, allocations of burdens of production and persuasion may depend on which party—plaintiff or defendant, petitioner or respondent—has made the "affirmative allegation" or "presumably has peculiar means of knowledge." 9 Wigmore, *supra*, § 2486, at 288, 290 (emphases deleted); accord *Campbell* v. *United States*, 365 U. S. 85, 96 (1961).

taken the same path had EPA initiated a civil action pursuant to § 113(a)(5)(C), or if the suit under consideration had been filed initially in state court.

Nor do we find compelling ADEC's suggestion, reiterated by the dissent, that, if state courts are not the exclusive judicial arbiters, EPA would be free to invalidate a BACT determination "months, even years, after a permit has been issued." Brief for Petitioner 35; *post*, at 512–514. This case threatens no such development. It involves preconstruction orders issued by EPA, see *supra*, at 481, not postconstruction federal Agency directives. EPA itself regards it as "imperative" to act on a timely basis, recognizing that courts are "less likely to require new sources to accept more stringent permit conditions the farther planning and construction have progressed." App. 273 (July 15, 1988, EPA guidance memorandum). In the one instance of untimely EPA action ADEC identifies, the federal courts declined to permit enforcement to proceed. See *United States* v. *AM General Corp.*, 34 F. 3d 472, 475.(CA7 1994) (affirming District Court's dismissal of an EPA-initiated enforcement action where EPA did not act until well after the facility received a PSD permit and completed plant modifications). EPA, we are confident, could not indulge in the inequitable conduct ADEC and the dissent hypothesize while the federal courts sit to review EPA's actions. Cf. *Walz* v. *Tax Comm'n of City of New York*, 397 U. S. 664, 678–679 (1970); *Panhandle Oil Co.* v. *Mississippi ex rel. Knox*, 277 U. S. 218, 223 (1928) (Holmes, J., dissenting), overruled in part by *Alabama* v. *King & Boozer*, 314 U. S. 1, 8–9 (1941).

In sum, EPA interprets the Act to allow substantive federal Agency surveillance of state permitting authorities' BACT determinations subject to federal-court review. We credit EPA's longstanding construction of the Act and confirm EPA's authority, pursuant to §§ 113(a)(5) and 167, to rule on the reasonableness of BACT decisions by state permitting authorities.

## IV

### A

We turn finally, and more particularly, to the reasons why we conclude that EPA properly exercised its statutory authority in this case. ADEC urges that, even if the Act allows the Agency to issue stop-construction orders when a state permitting authority unreasonably determines BACT, EPA acted impermissibly in this instance. See Brief for Petitioner 39–48. We note, first, EPA's threshold objection. ADEC's petition to this Court questioned whether the Act accorded EPA oversight authority with respect to a State's BACT determination. Pet. for Cert. 13–22. ADEC did not present, as a discrete issue, the question whether EPA, assuming it had authority to review the substance of a state BACT determination, nevertheless abused its authority by countermanding ADEC's permit for the Red Dog Mine expansion. See Brief for Respondents 44–45; cf. Reply Brief for Petitioner 15–16, n. 12 ("EPA ʻasserts authority to overturn only ʻarbitrary or unreasoned' state BACT determinations. . . . Thus, whether the State issued a reasoned justification is ʻfairly included' within the question presented[.]"). Treating the case-specific issue as embraced within the sole question presented, we are satisfied that EPA did not act arbitrarily in finding that ADEC furnished no tenable accounting for its determination that Low NOx was BACT for MG–17.

Because the Act itself does not specify a standard for judicial review in this instance,[18] we apply the familiar default standard of the Administrative Procedure Act, 5 U. S. C. § 706(2)(A), and ask whether the Agency's action was "arbi-

---

[18] The Court of Appeals referred to 42 U. S. C. § 7607(d)(9)(A) when it considered whether EPA's decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 298 F. 3d 814, 822 (CA9 2002). Section 7607(d)(9), however, applies only to the "subsection" concerning rulemaking in which it is embedded.

trary, capricious, an abuse of discretion, or otherwise not in accordance with law." Even when an agency explains its decision with "less than ideal clarity," a reviewing court will not upset the decision on that account "if the agency's path may reasonably be discerned." *Bowman Transp., Inc.* v. *Arkansas-Best Freight System, Inc.*, 419 U. S. 281, 286 (1974). EPA's three skeletal orders to ADEC and Cominco surely are not composed with ideal clarity. These orders, however, are properly read together with accompanying explanatory correspondence from EPA; so read, the Agency's comments and orders adequately ground the determination that ADEC's acceptance of Low NOx for MG–17 was unreasonable given the facts ADEC found.

In the two draft permits and the final permit, ADEC formally followed the EPA-recommended top-down methodology to determine BACT, as Cominco had done in its application. App. 61, 109, 175; see *supra*, at 475–476. Employing that methodology in the May 1999 draft permit, ADEC first concluded that SCR was the most stringent emission-control technology that was both "technically and economically feasible." App. 65; see *supra*, at 476. That technology should have been designated BACT absent "technical considerations, or energy, environmental, or economic impacts justif[ying] a conclusion that [SCR was] not 'achievable' in [this] case." New Source Review Manual, p. B.2; App. 61–62. ADEC nevertheless selected Low NOx as BACT; ADEC did so in May 1999 based on Cominco's suggestion that fitting all Red Dog Mine generators with Low NOx would reduce aggregate emissions. *Id.*, at 87, 111–112; see *supra*, at 476–477.

In September and December 1999, ADEC again rejected SCR as BACT but no longer relied on Cominco's suggestion that it could reduce aggregate emissions by equipping all generators with Low NOx. See *supra*, at 478–480. ADEC candidly stated that it aimed "[t]o support Cominco's Red Dog Mine Production Rate Increase Project, and its contri-

butions to the region." App. 208. In these second and third rounds, ADEC rested its selection of Low NOx squarely and solely on SCR's "disproportionate cost." *Id.,* at 116; *id.,* at 112–117, 203–208; *supra,* at 478–480.

EPA concluded that ADEC's switch from finding SCR economically feasible in May 1999 to finding SCR economically infeasible in September 1999 had no factual basis in the record. See App. 138. In the September and December 1999 technical analyses, ADEC acknowledged that "no judgment [could then] be made as to the impact of [SCR's] cost on the operation, profitability, and competitiveness of the Red Dog Mine." *Id.,* at 116, 207. ADEC nevertheless concluded that SCR would threaten both the Red Dog Mine's "unique and continuing impact on the economic diversity" of northwest Alaska and the mine's "world competitiveness." *Id.,* at 208. ADEC also stressed the mine's role as employer in an area with "historical high unemployment and limited permanent year-round job opportunities." *Id.,* at 207.

We do not see how ADEC, having acknowledged that no determination "[could] be made as to the impact of [SCR's] cost on the operation . . . and competitiveness of the [mine]," *ibid.,* could simultaneously proffer threats to the mine's operation or competitiveness as reasons for declaring SCR economically infeasible. ADEC, indeed, forthrightly explained why it was disarmed from reaching any judgment on whether, or to what extent, implementation of SCR would adversely affect the mine's operation or profitability: Cominco had declined to provide the relevant financial data, disputing the need for such information and citing "confidentiality" concerns, *id.,* at 134; see *supra,* at 479–480; 298 F. 3d, at 823 ("Cominco failed to meet its burden of demonstrating that SCR was economically infeasible."). No record evidence suggests that the mine, were it to use SCR for its new generator, would be obliged to cut personnel or raise zinc prices. Absent evidence of that order, ADEC lacked cause

for selecting Low NOx as BACT based on the more stringent control's impact on the mine's operation or competitiveness.

Nor has ADEC otherwise justified its choice of Low NOx. To bolster its assertion that SCR was too expensive, ADEC invoked four BACT determinations made in regard to diesel generators used for primary power production; BACT's cost, in those instances, ranged from $0 to $936 per ton of nitrogen oxide removed. App. 205–206; *supra*, at 480. ADEC itself, however, had previously found SCR's per-ton cost, then estimated as $2,279, to be "well within what ADEC and EPA considers economically feasible." App. 84; cf. *id.*, at 204 (estimating SCR's per ton cost to be $2,100). No reasoned explanation for ADEC's retreat from this position appears in the final permit. See *id.*, at 138 ("[SCR's cost falls] well within the range of costs EPA has seen permitting authorities nationwide accept as economically feasible for NOx control except where there are compelling site specific factors that indicate otherwise."). Tellingly, as to examples of low-cost BACT urged by Cominco, ADEC acknowledged: "The cited examples of engines permitted in Alaska without requiring SCR are not valid examples as they either took place over 18 months ago or were not used for similar purposes." *Id.*, at 233–234 (footnote omitted). ADEC added that it has indeed "permitted [Alaska] projects requiring SCR." *Id.*, at 234. Further, EPA rejected ADEC's comparison between the mine and a rural utility, see *supra*, at 479, because "no facts exist to suggest that the 'economic impact' of the incrementally higher cost of SCR on the world's largest producer of zinc concentrates would be anything like its impact on a rural, non-profit utility that must pass costs on to a small base of individual consumers," Brief for Respondents 49; App. 138–139 (similar observation in Nov. 10, 1999, EPA letter).

ADEC's basis for selecting Low NOx thus reduces to a readiness "[t]o support Cominco's Red Dog Mine Production Rate Increase Project, and its contributions to the region."

*Id.*, at 208.   This justification, however, hardly meets ADEC's own standard of a "source-specific . . . economic impac[t] which demonstrate[s] [SCR] to be inappropriate as BACT."   *Id.*, at 177.   In short, as the Ninth Circuit determined, EPA validly issued stop orders because ADEC's BACT designation simply did not qualify as reasonable in light of the statutory guides.

In its briefs to this Court, ADEC nonetheless justifies its selection of Low NOx as BACT for MG–17 on the ground that lower aggregate emissions would result from Cominco's "agree[ment] to install Low NOx on *all* its generators." Brief for Petitioner 42, and n. 12 (emphasis added); *id.*, at 29; Reply Brief for Petitioner 19, n. 16.   We need not dwell on ADEC's attempt to resurrect Cominco's emissions-offsetting suggestion, see *supra*, at 477, adopted in the initial May 1999 draft permit, but thereafter dropped.   As ADEC acknowledges, the final PSD permit did not offset MG–17's emissions against those of the mine's six existing generators, installations that were not subject to BACT.   Brief for Petitioner 42, n. 12; App. 149.   ADEC recognized in September and December 1999 that a State may treat emissions from several pollutant sources as falling under one "bubble"[19] for PSD permit purposes only if every pollutant source so aggregated is "part of the permit action."   *Id.*, at 111, 199.   Offsetting new emissions against those from any of the mine's other generators, ADEC agreed, "[was] not a consideration of the BACT review provided for by the applicable law or guidelines," for those generators remained outside the permit's compass.   *Id.*, at 112, 199.   ADEC plainly did not, and could not, base its December 10, 1999, permit and technical analysis on an emissions-offsetting rationale drawing in gen-

---

[19] Cf. *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837, 853–859 (1984) (upholding EPA regulations allowing States to treat all pollutant-emitting devices within the same stationary source in a nonattainment area as though encased in a single "bubble").

erators not subject to BACT. *Id.*, at 111–112.[20] By that time, only MG–17 was "part of the permit action." *Id.*, at 111, 199.

## B

We emphasize that today's disposition does not impede ADEC from revisiting the BACT determination in question. In letters and orders throughout the permitting process, EPA repeatedly commented that it was open to ADEC to prepare "an appropriate record" supporting its selection of Low NOx as BACT. Tr. of Oral Arg. 35; see App. 127 (attachment to Sept. 28, 1999, EPA letter to ADEC, stating "an analysis of whether requiring Cominco to install and operate [SCR] would have any adverse economic impacts upon Cominco specifically" might demonstrate SCR's economic infeasibility); *id.*, at 150 (letter accompanying EPA's Dec. 10, 1999, finding of noncompliance and order reiterating the Agency's willingness to "review and consider any additional information or analyses provided by ADEC or Cominco" on Low NOx as BACT); App. to Pet. for Cert. 36a (EPA Dec. 10, 1999, order inviting ADEC to justify its choice of Low NOx by "document[ing] why SCR is not BACT [for MG–17]"); *id.*, at 49a (similar statement in Feb. 8, 2000, order). At oral argument, counsel for EPA reaffirmed that, "absolutely," ADEC could reconsider the matter and, on an "appropriate

[20] The May 4, 1999, draft permit considered whether adding Low NOx to seven generators would result in lower emissions than adding SCR to only two and choosing one of the latter as a standby unit. App. 86–87. Before December 10, 1999, however, Cominco agreed to install Low NOx controls on four of the mine's six existing generators—MG–1, MG–3, MG–4, and MG–5—in order to increase use of those generators without exceeding the 1994 PSD permit's operating restriction. *Id.*, at 149. Having agreed to use Low NOx on four generators, Cominco could propose in the December 10, 1999, permit only the addition of Low NOx to two generators—MG–2 and MG–6—to offset increases in emissions from MG–17. No facts in the record support any suggestion that addition of Low NOx to three generators, MG–2, MG–6, and MG–17, would result in lower aggregate emissions than the addition of SCR to MG–17 alone.

record," endeavor to support Low NOx as BACT. Tr. of Oral Arg. 35.[21] We see no reason not to take EPA at its word.

\*　　\*　　\*

In sum, we conclude that EPA has supervisory authority over the reasonableness of state permitting authorities' BACT determinations and may issue a stop-construction order, under §§ 113(a)(5) and 167, if a BACT selection is not reasonable. We further conclude that, in exercising that authority, the Agency did not act arbitrarily or capriciously in finding that ADEC's BACT decision in this instance lacked evidentiary support. EPA's orders, therefore, were neither arbitrary nor capricious. The judgment of the Court of Appeals is accordingly

*Affirmed.*

JUSTICE KENNEDY, with whom THE CHIEF JUSTICE, JUSTICE SCALIA, and JUSTICE THOMAS join, dissenting.

The majority, in my respectful view, rests its holding on mistaken premises, for its reasoning conflicts with the express language of the Clean Air Act (CAA or Act), with sound rules of administrative law, and with principles that preserve the integrity of States in our federal system. The State of Alaska had in place procedures that were in full compliance with the governing statute and accompanying regulations promulgated by the Environmental Protection Agency (EPA). As I understand the opinion of the Court and the parties' submissions, there is no disagreement on this point. Alaska followed these procedures to determine the best available control technology (BACT). EPA, how-

---

[21] The dissent is daunted by the hypothesis that "[b]ecause there can always be an additional procedure to ensure that the preceding process was followed," the State "may never reach" the goal of issuing a permit. *Post*, at 515 ("The majority creates a sort of Zeno's paradox for state agencies."). Again, the dissent can point to no instance in which EPA has indulged in any piling of process upon process. See *supra*, at 493, n. 16.

ever, sought to overturn the State's decision, not by the process of judicial review, but by administrative fiat. The Court errs, in my judgment, by failing to hold that EPA, based on nothing more than its substantive disagreement with the State's discretionary judgment, exceeded its powers in setting aside Alaska's BACT determination.

## I

As the majority explains, the case begins with §§ 113(a)(5) and 167 of the Act. 42 U. S. C. §§ 7413(a)(5), 7477. These provisions give EPA authority to enforce "requirements" of the CAA. The meaning of the word "requiremen[t]," though, is not defined in these provisions. Other provisions of the Act must be consulted. All parties agree that the requirement in this case is the "preconstruction requiremen[t]" that a "major emitting facility" be "subject to the best available control technology [BACT] for each pollutant subject to regulation under this chapter emitted from, or which results from, such facility." § 7475(a)(4). BACT, in turn, is defined as

> "an emission limitation based on the maximum degree of reduction of each pollutant subject to regulation under this chapter emitted from or which results from any major emitting facility, which the permitting authority, *on a case-by-case basis, taking into account energy*, environmental, and economic impacts and other costs, determines is achievable for such facility through application of production processes and available methods, systems, and techniques . . . ." § 7479(3).

The majority holds that, under the CAA, state agencies are vested with "initial responsibility for identifying BACT in line with the Act's definition of that term" and that EPA has a "broad oversight role" to ensure that a State's BACT determination is "reasonably moored to the Act's provisions." *Ante*, at 484–485. The statute, however, contem-

plates no such arrangement. It directs the "permitting authority"—here, the Alaska Department of Environmental Conservation (ADEC)—to "determine" what constitutes BACT. To "determine" is not simply to make an initial recommendation that can later be overturned. It is "[t]o decide or settle . . . conclusively and authoritatively." American Heritage Dictionary 495 (4th ed. 2000). Cf. 5 U. S. C. § 554 ("to be determined on the record after opportunity for an agency hearing").

The BACT definition presumes that the permitting authority will exercise discretion. It presumes, in addition, that the BACT decision will accord full consideration to the statutory factors and other relevant and necessary criteria. Contrary to the majority's holding, the statute does not direct the State to find as BACT the technology that results in the "maximum reduction of a pollutant achievable for [a] facility" in the abstract. *Ante,* at 485 (internal quotation marks omitted). Indeed, for a State to do so without regard to the other mandatory criteria would be to ignore the words of the statute. The Act requires a more comprehensive judgment. It provides that the permitting authority must "tak[e] into account" a set of contextual considerations—"energy, environmental, and economic impacts and other costs"—to identify the best control technology "on a case-by-case basis." 42 U. S. C. § 7479(3). The majority reaches its narrow view of the scope of the State's discretion only by wresting two adjectives, "maximum" and "achievable," out of context. In doing so, it ignores "the cardinal rule that a statute is to be read as a whole." *King* v. *St. Vincent's Hospital,* 502 U. S. 215, 221 (1991).

To be sure, §§ 113(a)(5) and 167 authorize EPA to enforce requirements of the Act. These provisions, however, do not limit the States' latitude and responsibility to balance all the statutory factors in making their discretionary judgments. If a State has complied with the Act's requirements, §§ 113(a)(5) and 167 are not implicated and can supply no sep-

arate basis for EPA to exercise a supervisory role over a State's discretionary decision. The Court of Appeals for the Ninth Circuit had it altogether backwards when it reasoned that, "because neither Section 113(a)(5) nor Section 167 contains any exemption for requirements that involve the state's exercise of discretion," EPA had the authority to issue orders countermanding the State's BACT determination. 298 F. 3d 814, 820 (2002). The question is not whether the two sections contain any exemption. Rather, it is about the nature of the Act's requirements and whether EPA has the authority to set aside a BACT determination when no requirement of the Act was violated in the first place. In affirming the judgment of the Court of Appeals, the majority repeats the same analytical error. See *ante*, at 490 ("We fail to see why Congress, having expressly endorsed an expansive surveillance role for EPA in two independent CAA provisions, would then implicitly preclude the Agency from verifying substantive compliance with [BACT] . . ."). When the statute is read as a whole, it is clear that the CAA commits BACT determinations to the discretion of the relevant permitting authorities. Unless an objecting party, including EPA, prevails on judicial review, the determinations are conclusive.

Here the state agency, ADEC, recognized it was required to make a BACT determination. It issued two detailed reports in response to comments by interested parties and concluded that Low Nitrogen Oxide (NOx) was BACT. The requirement that the agency weigh the list of statutory factors, study all other relevant considerations, and decide the technology that can best reduce pollution within practical constraints was met in full. As even EPA acknowledged, ADEC "provid[ed] a detailed accounting of the process." App. 286. This is not a case, then, where the state agency failed to have a BACT review procedure in place or altogether refused to apply the statute's formal requirements. EPA's only quarrel is with ADEC's substantive conclusion.

In disagreeing with ADEC, EPA's sole contention, in the section of its order titled "Findings of *Fact*," is that "[selective catalytic reduction] is BACT." App. to Pet. for Cert. 30a, 34a (emphasis added). In addition, EPA does not allege that using Low NOx would violate other CAA requirements, such as the National Ambient Air Quality Standards, Alaska's Prevention of Significant Deterioration (PSD) increments, or other applicable emission standards, see 42 U. S. C. § 7475(a)(3). On this state of the record there is no deviation from any statutory "requirement." As a result, EPA has no statutory basis to invoke the enforcement authority of §§ 113(a)(5) and 167.

When Congress intends to give EPA general supervisory authority, it says so in clear terms. In addition to requiring EPA's advance approval of BACT determinations in some instances, 42 U. S. C. § 7475(a)(8), the statute grants EPA powers to block the construction or operation of polluting sources in circumstances not at issue here, §§ 7426(b), (c)(1), 7410(a)(2)(D)(i). Outside the context of the CAA, Congress likewise knows how to establish federal oversight in unambiguous language. See, *e. g.*, 42 U. S. C. § 1396a(a)(13)(A) (1994 ed.) (requiring, under the Medicaid Act, reimbursement according to rates that a "State finds, and makes assurances satisfactory to the Secretary [of Health and Human Services], are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities"); *Wilder v. Virginia Hospital Assn.*, 496 U. S. 498 (1990). No analogous language is used in the statutory definition of BACT.

EPA insists it needs oversight authority to prevent a "race to the bottom," where jurisdictions compete with each other to lower environmental standards to attract new industries and keep existing businesses within their borders. Whatever the merits of these arguments as a general matter, EPA's distrust of state agencies is inconsistent with the Act's clear mandate that States bear the primary role in control-

ling pollution and, here, the exclusive role in making BACT determinations. In "cho[osing] not to dictate a Federal response to balancing sometimes conflicting goals" at the expense of "[m]aximum flexibility and State discretion," H. R. Rep. No. 95–294, p. 146 (1977), Congress made the overriding judgment that States are more responsive to local conditions and can strike the right balance between preserving environmental quality and advancing competing objectives. By assigning certain functions to the States, Congress assumed they would have a stake in implementing the environmental objectives of the Act. At the same time, Congress charged EPA with setting ambient standards and enforcing emission limits, 42 U. S. C. § 7475(a)(3), to ensure that the Nation takes the necessary steps to reduce air pollution.

The presumption that state agencies are not to be trusted to do their part is unwarranted in another respect: EPA itself said so. As EPA concedes, States, by and large, take their statutory responsibility seriously, and EPA sees no reason to intervene in the vast majority of cases. Brief for Respondents 30, n. 9; 57 Fed. Reg. 28095 (1992) ("States have been largely successful in ['administering and enforcing the various components of the PSD program'], and EPA's involvement in interpretative and enforcement issues is limited . . ."). In light of this concession, EPA and *amici* not only fail to overcome the established presumption that States act in good faith, see *Alden* v. *Maine,* 527 U. S. 706, 755 (1999) ("We are unwilling to assume the States will refuse to honor . . . or obey the binding laws of the United States"), but also admit that their fears about a race to the bottom bear little relation to the real-world experience under the statute. See *ante,* at 502 ("We see no reason not to take EPA at its word").

## II

The statute contains safeguards to correct arbitrary and capricious BACT decisions when they do occur. Before EPA approves a State's PSD permit program that allows a

state agency to make BACT determinations, EPA must be satisfied that the State provides "an opportunity for state judicial review." 61 Fed. Reg. 1882 (1996). Furthermore, before an individual permit may issue, the State must allow all "interested persons," including "representatives of the [EPA] Administrator," to submit comments on, among other things, "control technology requirements." 42 U. S. C. § 7475(a)(2). To facilitate EPA's participation in the State's public comment process, the statute further provides that specific procedures be followed to inform the EPA Administrator of "every action" taken in the course of the permit approval process. § 7475(d) ("Each State shall transmit to the Administrator a copy of each permit application relating to a major emitting facility received by such State and provide notice to the Administrator of every action related to the consideration of such permit"). Any person who participated in the comment process can pursue an administrative appeal of the State's decision, followed, as mentioned, by judicial review in state courts.

EPA followed none of the normal procedures here. Only after the period for public comments expired did it intervene and seek to overturn Alaska's decision that Low NOx was BACT. To justify its decision to opt out of the State's administrative and judicial review process and, instead, to issue a unilateral order after everyone had spoken, EPA complains that it has not before intervened in "any State administrative review proceedings in State courts" and should not now be forced to do so. Tr. of Oral Arg. 35. With scant analysis, the majority agrees. *Ante*, at 492 ("It would be unusual, to say the least, for Congress to remit a federal agency enforcing federal law solely to state court. We decline to read such an uncommon regime into the Act's silence"). The problem, of course, is that it is all the more unusual to allow a federal agency to take unilateral action to set aside a State's administrative decision.

Despite EPA's protestations, the statute makes explicit provision for EPA to challenge a state agency's BACT determination in state proceedings. The statute requires States to set up an administrative process for "interested persons" to submit comments. § 7475(a)(2). "[I]nterested persons," Congress took care to note, include "representatives of the [EPA] Administrator." *Ibid.;* see also Alaska Stat. § 46.14.990(20) (2002) (defining "person" to include "an agency of the United States"). Given that EPA itself requires, as a condition of approving a State's PSD program, that this process culminate in judicial review in state courts, 61 Fed. Reg., at 1882, it follows that EPA, a subset of all "interested persons," must take the same procedural steps and cannot evade the more painstaking state process by a mere stroke of the pen under the agency's letterhead.

On a more fundamental level, EPA and the majority confuse a substantive environmental statute like the CAA with a general administrative law statute like the Administrative Procedure Act (APA). EPA, the federal agency charged only with the CAA's implementation, has no roving commission to ferret out arbitrary and capricious conduct by state agencies under the state equivalent of the APA. That task is left to state courts. See *Idaho* v. *Coeur d'Alene Tribe of Idaho,* 521 U. S. 261, 276 (1997) ("[T]he elaboration of administrative law . . . is one of the primary responsibilities of the state judiciary").

Like federal courts, state courts are charged with reviewing agency actions to ensure that they comport with principles of rationality and due process. See, *e. g.,* 5 U. S. C. § 706(2)(A); Alaska Stat. § 44.62.570(b)(3) (2002). Counsel for respondents were unable to identify, either in their briefs or at oral argument, a single State that "does not have in its law the requirement that its own agencies . . . act rationally." Tr. of Oral Arg. 30. Although it remains an open question whether EPA can bypass the state judiciary and go directly into federal district court under 28 U. S. C. § 1345, the avail-

ability of state judicial review defeats the Government's argument that, absent EPA's oversight, there is a legal vacuum where BACT decisions are not subject to review.

Requiring EPA to seek administrative and judicial review of a State's BACT determination, instead of allowing it to be overturned by fiat, avoids the anomaly of shifting the burden of pleading and of initiating litigation from EPA to the State. Whether the BACT decision is reviewed in state court, or in federal district court if that option is available, see *supra*, at 509 and this page, EPA, as petitioner, bears the initial burden and costs of filing a petition for review alleging that the State acted arbitrarily. Under the scheme endorsed by the majority today, the tables are turned. Once EPA has issued an enforcement order, and the State seeks to invalidate that order, the State bears the burden of alleging that EPA acted arbitrarily. EPA and the majority concede that, because States enjoy substantial discretion in making BACT determinations, courts reviewing EPA's order must ask not simply whether EPA acted arbitrarily but the convoluted question whether EPA acted arbitrarily in finding the State acted arbitrarily. Even under this unwieldy standard of review, and even if the burdens of persuasion and production remain with EPA, see *ante*, at 493–494, the initial burden of pleading and litigation now belongs to the State.

To make its decision more palatable, the majority holds that EPA still bears the burdens of production and persuasion, but there is little authority for this. The Court purports to rely on McCormick on Evidence for the proposition that "'looking for the burden of pleading is not a foolproof guide to the allocation of the burdens of proof.'" *Ante,* at 494, n. 17 (quoting 2 J. Strong, McCormick on Evidence § 337, pp. 411–412 (5th ed. 1999)). The example—affirmative defense—discussed in that passage of the treatise, however, is far afield from the issues raised in this case. In fact, the treatise instructs that "[i]n most cases, the party who has the burden of pleading a fact will have the burdens of producing

evidence and of persuading the jury of its existence as well."
*Id.*, at 411. This is because "[t]he burdens of pleading and
proof with regard to most facts have been and should be
assigned to the plaintiff who generally seeks to change the
present state of affairs and who therefore naturally should
be expected to bear the risk of failure of proof or persua-
sion." *Id.*, at 412. In this case, EPA changed the *status
quo ante* by issuing an order invalidating ADEC's decision.
Without upsetting accepted evidentiary principles, the ma-
jority cannot explain why EPA, as respondent in federal
court—as opposed to the State, as petitioner alleging that
EPA's *fait accompli* was arbitrary—should bear the burdens
of persuasion and production, or how this unusual realloca-
tion of burdens should work in practice.

In any event, even the majority accepts that, under its
reading of the statute, the State now bears the burden of
pleading. With this burden-shifting benefit alone, EPA is
most unlikely to follow the procedure, prescribed by federal
law, of participating in the State's administrative process and
seeking judicial review in state courts. Instead, EPA can
simply issue a unilateral order invalidating the State's BACT
determination and put the burden on the State to challenge
EPA's order. This end run around the State's process is
sure to undermine it. Unless Congress was on a fool's er-
rand, the loophole the majority finds goes only to demon-
strate the inconsistency between its approach and the statu-
tory scheme.

There is a further, and serious, flaw in the Court's ruling.
Suppose, before EPA issued its orders setting aside the
State's BACT determination, an Alaska state court had re-
viewed the matter and found no error of law or abuse of
discretion in ADEC's determination. The majority's inter-
pretation of the statute would allow EPA to intervene at this
point for the first time, announce that ADEC's determination
is unreasoned under the CAA, and issue its own orders nulli-
fying the state court's ruling. This reworking of the bal-

ance between State and Federal Governments, not to mention the reallocation of authority between the Executive and Judicial Branches, shows the implausibility of the majority's reasoning.

If a federal agency were to exercise an analogous power to review the decisions of federal courts, the arrangement would violate the well-established rule that the judgments of Article III courts cannot be revised by the Executive or Legislative Branches. See *Hayburn's Case,* 2 Dall. 409, 410, n. (1792) ("'[B]y the Constitution, neither the Secretary [of] War, nor any other Executive officer, nor even the Legislature, are authorized to sit as a court of errors on . . . judicial acts or opinions . . .'"); see also *Plaut* v. *Spendthrift Farm, Inc.,* 514 U. S. 211 (1995). The principle that judicial decisions cannot be reopened at the whim of the Executive or the Legislature is essential to preserving separation of powers and judicial independence. Judges cannot, without sacrificing the autonomy of their office, put onto the scales of justice some predictive judgment about the probability that an administrator might reverse their rulings.

The Court today denies state judicial systems the same judicial independence it has long guarded for itself—only that the injury here is worse. Under the majority's holding, decisions by state courts would be subject to being overturned, not just by any agency, but by an agency established by a different sovereign. We should be reluctant to interpret a congressional statute to deny to States the judicial independence guaranteed by their own constitutions. See *Buckalew* v. *Holloway,* 604 P. 2d 240, 245 (Alaska 1979) ("There is no doubt that judicial independence was a paramount concern of the delegates [to the Alaska Constitutional Convention]"); see also, *e. g.,* Cal. Const., Art. 3, § 3 ("The powers of state government are legislative, executive, and judicial. Persons charged with the exercise of one power may not exercise either of the others except as permitted by this Constitution"); see also 7 B. Witkin, Summary of

California Law § 107, pp. 159–160 (9th ed. 1988) ("[Under] the principle of separation of powers . . . , one [department] cannot exercise or interfere with the functions of either of the others"). The Federal Government is free, within its vast legislative authority, to impose federal standards. For States to have a role, however, their own governing processes must be respected. *New York* v. *United States*, 505 U. S. 144 (1992). If, by some course of reasoning, state courts must live with the insult that their judgments can be revised by a federal agency, the Court should at least insist upon a clear instruction from Congress. That directive cannot be found here. Cf. *Gregory* v. *Ashcroft*, 501 U. S. 452, 460 (1991) ("[I]f Congress intends to alter the usual constitutional balance between the States and the Federal Government, it must make its intention to do so unmistakably clear in the language of the statute" (internal quotation marks omitted)).

There is a final deficiency in the scheme the majority finds in the statute. Nothing in the Court's analysis prevents EPA from issuing an order setting aside a BACT determination months, or even years, later. Congress cannot have intended this result. After all, when Congress provides for EPA's involvement, it directs the agency to act sooner rather than later by establishing a preauthorization procedure. 42 U. S. C. § 7475(a)(8). The majority misses the point when it faults ADEC for "overlook[ing] the obvious difference between a statutory requirement . . . and a statutory authorization." *Ante,* at 491 (emphasis deleted). ADEC does not overlook the difference between approval before the fact and oversight after the fact. Rather, ADEC, unlike the majority, recognizes that the Act's explicit provision for a preauthorization process underscores the need for finality in state permitting decisions, making implausible an interpretation of the statute that would allow a *post hoc* veto procedure that upsets the same reliance and expectation interests.

The majority's initial response that "[t]his case threatens no such development [because] [i]t *involves preconstruction orders issued by EPA . . . ,* not postconstruction federal Agency directives," *ante,* at 495, provides no assurance that the logic of its reasoning would not in the future allow EPA's belated interventions. When the majority confronts the problem, it concludes that "EPA, we are confident, could not indulge in the inequitable conduct ADEC and the dissent hypothesize while the federal courts sit to review EPA's actions." *Ibid.* The authority it cites for this proposition, however, consists of nothing more than a religious exemption case that is far removed from the issues presented here and a dissent from a case that has been overruled in part. *Ibid.* State agencies rely on this dictum at their own risk.

The majority's reassurance to the States will likely be to no avail. "The principle that the United States are not bound by any statute of limitations, nor barred by any laches of their officers, however gross, in a suit brought by them as a sovereign Government to enforce a public right, or to assert a public interest, is established past all controversy or doubt." *United States* v. *Beebe,* 127 U. S. 338, 344 (1888); see also *United States* v. *Summerlin,* 310 U. S. 414, 416 (1940) ("It is well settled that the United States is not bound by state statutes of limitation or subject to the defense of laches in enforcing its rights"); *Utah Power & Light Co.* v. *United States,* 243 U. S. 389, 409 (1917) ("[L]aches or neglect of duty on the part of officers of the Government is no defense to a suit by it to enforce a public right or protect a public interest. . . . A suit by the United States to enforce and maintain its policy . . . stands upon a different plane in this and some other respects from the ordinary private suit . . ."). Section 167, moreover, is mandatory. Once a violation of a statutory "requirement" is found, "[t]he Administrator shall . . . take such measures, including issuance of an order, or seeking injunctive relief, as necessary to prevent the construction or modification of a major emitting fa-

cility which does not conform to the requirements of this part . . . ." 42 U. S. C. § 7477. In short, EPA's enforcement authority can—indeed, must—be exercised at any point. In light of our precedents a court would be hard pressed to hold otherwise.

The majority seeks to limit the consequence of its holding by quoting the response by respondents' counsel at oral argument that ADEC could "absolutely" arrive at the same BACT determination if only it would pile on another layer of procedure and justify its decision on an "'appropriate record.'" *Ante*, at 501–502 (quoting Tr. of Oral Arg. 35). As the Court of Appeals recognized in a prior case, however, this option gives no solace to the States:

> "The hardship is the process itself. Process costs money. If a federal licensee must spend years attempting to satisfy an elaborate, shifting array of state procedural requirements, then he must borrow a fortune to pay lawyers, economists, accountants, archaeologists, historians, engineers, recreational consultants, environmental consultants, biologists and others, with no revenue, no near-term prospect of revenue, and no certainty that there ever will be revenue. Meanwhile, politics, laws, interest rates, construction costs, and costs of alternatives change. Undue process may impose cost and uncertainty sufficient to thwart the federal determination that a power project should proceed." *Sayles Hydro Associates* v. *Maughan*, 985 F. 2d 451, 454 (CA9 1993).

If there is to be a second look, notwithstanding the 18 months ADEC spent analyzing BACT, a third or fourth look is just as permissible. The majority creates a sort of Zeno's paradox for state agencies. Because there can always be an additional procedure to ensure that the preceding process was followed, no matter how many steps States take toward the objective, they may never reach it.

This is a most regrettable result. In the proper discharge of their responsibilities to implement the CAA in different conditions and localities nationwide, the States maintain permanent staffs within special agencies. These state employees, who no doubt take pride in their own resourcefulness, expertise, and commitment to the law, are the officials directed by Congress to make case-by-case, site-specific, determinations under the Act. Regulated persons and entities should be able to consult an agency staff with certainty and confidence, giving due consideration to agency recommendations and guidance. After today's decision, however, a state agency can no longer represent itself as the real governing body. No matter how much time was spent in consultation and negotiation, a single federal administrator can in the end set all aside by a unilateral order. This is a great step backward in Congress' design to grant States a significant stake in developing and enforcing national environmental objectives.

If EPA were to announce that permit applications subject to BACT review must be submitted to it in the first instance and can be forwarded to the State only with EPA's advance approval, I should assume even the majority would find the basic structure of the BACT provisions undercut. In practical terms, however, the majority displaces state agencies, and degrades their role, in much the same way. In the case before us the applicant made elaborate submissions to ADEC. For over a year and a half, there ensued the constructive discourse that is the very object of the agency process, with both the ADEC staff and the applicant believing the State's decision would be dispositive. EPA did not participate in the administrative process, but waited until after the record was closed to intervene by issuing an order setting aside the BACT determination.

We are advised that an applicant sometimes must spend up to $500,000 on the permit process and that, for a complex project, the time for approval can take from five to

seven years. Brief for National Environmental Development Association et al. as *Amici Curiae* 8. Under the new multiple-tiered process, permit expenditures become less justified, state officials less credible, reliance less certain. The Court should be under no illusion that its decision respects the State's administrative process.

The federal balance is remitted, in many instances, to Congress. Here the Court remits it to a single agency official. This is inconsistent with the assurance Congress gave to regulated entities when it allowed state agencies to decide upon the grant or denial of a permit under the BACT provisions of the CAA.

## III

In the end EPA appears to realize the weakness of its arguments and asks us simply to defer to its expertise in light of the purported statutory ambiguity. See Brief for Respondents 41–43 (asking for deference under *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837 (1984)). To its credit, the majority holds *Chevron* deference inapplicable. Deference is inappropriate for all the reasons the majority recites, *ante*, at 487–488, plus one more: The statute is not in any way ambiguous. As a result, our inquiry should proceed no further.

Actions, however, speak louder than words, and the majority ends up giving EPA the very *Chevron* deference—and more—it says should be denied. The Court's opinion is chock full of *Chevron*-like language. Compare 467 U. S., at 843 ("whether the agency's answer is based on a permissible construction of the statute"); *id.*, at 845 ("whether the Administrator's view . . . is a reasonable one"), with *ante*, at 488 ("[EPA's] arguments do not persuade us to reject [them] as impermissible"); *ante*, at 493 ("That rational interpretation, we agree, is surely permissible"). So deficient are its statutory arguments that the majority must hide behind *Chevron*'s vocabulary, despite its explicit holding that *Chevron* does not apply. In applying *Chevron de facto* under these

circumstances, however, the majority undermines the well-established distinction our precedents draw between *Chevron* and less deferential forms of judicial review.

The broader implication of today's decision is more unfortunate still. The CAA is not the only statute that relies on a close and equal partnership between federal and state authorities to accomplish congressional objectives. See, *e. g., New York* v. *United States,* 505 U. S., at 167 (listing examples). Under the majority's reasoning, these other statutes, too, could be said to confer on federal agencies ultimate decisionmaking authority, relegating States to the role of mere provinces or political corporations, instead of coequal sovereigns entitled to the same dignity and respect. Cf. *Alden* v. *Maine,* 527 U. S. 706 (1999). If cooperative federalism, *Hodel* v. *Virginia Surface Mining & Reclamation Assn., Inc.,* 452 U. S. 264, 289 (1981), is to achieve Congress' goal of allowing state governments to be accountable to the democratic process in implementing environmental policies, federal agencies cannot consign States to the ministerial tasks of information gathering and making initial recommendations, while reserving to themselves the authority to make final judgments under the guise of surveillance and oversight.

For these reasons, and with all respect, I dissent from the opinion and the judgment of the Court.