**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

BILL MACCLARENCE,
                    *Petitioner,*

            v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY; STEPHEN L.
JOHNSON,

                    *Respondents.*

No. 07-72756

OPINION

On Petition for Review of an Order of the
Environmental Protection Agency

Argued and Submitted
February 5, 2009—Portland, Oregon

Filed March 4, 2010

Before: Richard A. Paez and Johnnie B. Rawlinson,
Circuit Judges, and Raner C. Collins,* District Judge.

Opinion by Judge Paez

---

*The Honorable Raner C. Collins, United States District Judge for the
District of Arizona, sitting by designation.

## COUNSEL

Robert Ukeiley, Law Office of Robert Ukeiley, Berea, Kentucky, William M. Eddie, Field Jerger, LLP, Portland, Oregon, for the petitioner.

Ronald J. Tenpas, Assistant Attorney General, John C. Cruden, Deputy Assistant Attorney General, Andrew J. Doyle, Attorney, Environment & Natural Resources Division, Department of Justice, Washington, DC, Kristi M. Smith, Office of General Counsel, Environmental Protection Agency, Washington, DC, Julie A. Vergeront, Office of Regional Counsel, Region 10, Environmental Protection Agency, Seattle, Washington, for respondents United States Environmental Protection Agency, and Stephen L. Johnson, Administrator, United States Environmental Protection Agency.

## OPINION

PAEZ, Circuit Judge:

Bill MacClarence petitions this court for review of an order by the Environmental Protection Agency Administrator (the "Administrator") denying his request that the Environmental Protection Agency ("EPA") object to the issuance of a Clean Air Act Title V permit for pollutant-emitting activities at Gathering Center #1 ("GC 1"), an oil and gas processing facility in Prudhoe Bay. The Alaska Department of Environmental Conservation's ("ADEC") granted the permit to British Petroleum Exploration (Alaska), Inc.'s ("BP"), which owns GC 1. We have jurisdiction to review MacClarence's petition for review pursuant to 42 U.S.C. §§ 7661d(b)(2) and 7607(b)(1). Because the Administrator's denial of MacClarence's request was not arbitrary or capricious, we deny the petition.

## I. Background

### A. The Prudhoe Bay Unit

The Prudhoe Bay Unit (PBU) is located on the North Slope of Alaska and extends over 300 square miles. It consists of a

series of oil and gas facilities, including thirty-eight drill sites or "well pads" and six production centers, as well as support facilities for PBU workers. GC 1 is one of the six production facilities at the PBU. BP owns approximately 26.35% to 50.7% of the facilities at the PBU, including GC 1, and operates all of the PBU facilities pursuant to an agreement with the other owners. Although the PBU oil field is composed of a number of different oil leases, those leases have been unitized or pooled by the State of Alaska so that the field may be exploited efficiently.

The PBU facilities are engaged in a continuum of oil and gas refining activities, from drilling to sale.[1] Well pads in the PBU pump "three-phase" crude oil from the tundra beneath the PBU facilities. This oil is transferred to the production centers, including GC 1, where it is separated into processed crude oil, water, and hydrocarbon gases. The processed crude oil is pumped from the production centers to the Trans-Alaska Pipeline for sale, while other facilities at the PBU dispose of or re-inject the by-products of the production process.

## B.  Title V of the Clean Air Act

MacClarence petitioned the Administrator to object to a final permit issued for GC 1 pursuant to Title V of the Clean Air Act (the "CAA"), 42 U.S.C. §§ 7401 *et seq*. The CAA was enacted in 1963 to "protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population." § 7401(b)(1). Built on a scheme of "cooperative federalism,"

---

[1]The various functions and the interconnectedness of the PBU facilities are too complex to describe fully here. The brief description of the facilities and activities of the PBU is intended only to provide background and context for our opinion. For a more extensive discussion of the PBU oil and gas production and processing facilities, see generally Alaska Department of Environmental Conservation Air Quality Operating/Construction Permit, Permit No. 182TVP01 (Feb. 17, 2004) ("Revision 1"), http://www.dec.state.ak.us/air/ap/docs/182tvp01r1.pdf.

the CAA places the onus of enforcement on state and local governments, but "provides for 'Federal financial assistance and leadership . . . for the development of cooperative, Federal, State, regional, and local programs to prevent and control air pollution.' " *N.Y. Pub. Interest Research Group v. Whitman (NYPIRG I)*, 321 F.3d 316, 320 (2d Cir. 2003) (quoting 42 U.S.C. § 7401(a)(3), (4); *Connecticut v. EPA*, 696 F.2d 147, 151 (2d Cir. 1982)).

The Clean Air Act Amendments of 1990, Pub. L. No. 101-549, §§ 501-07, 104 Stat. 2399, 2635-48 (1990), enacted Title V of the CAA, which requires facilities that are "major sources" of pollutants to obtain operating permits from state-run permitting programs that have been approved by EPA. *See* 42 U.S.C. § 7661a. ADEC is Alaska's EPA-approved Title V permitting authority. 66 Fed. Reg. 63,184, 63,184 (Dec. 5, 2001). Each permit must "include enforceable emission limitations and standards, a schedule of compliance, a requirement that the permittee submit to the permitting authority . . . the results of any required monitoring, and such other conditions as are necessary to assure compliance with applicable requirements of [the CAA]." 42 U.S.C. § 7661c(a). Title V, however, does not itself impose additional substantive clean air standards. 40 C.F.R. § 70.1(b).

Title V further provides for both EPA and public review of permits. 42 U.S.C. § 7661d; 40 C.F.R. § 70.8(d). After a permitting authority receives an application for a Title V permit, it is required to submit a copy of the permit application and the "permit proposed to be issued and issued as a final permit" to EPA, 42 U.S.C. § 7661d(a)(1)(B), and to provide the public with notice and opportunity to comment on the draft permit, 40 C.F.R. § 70.7(h). If the permit "contains provisions that are determined by the Administrator as not in compliance with the applicable requirements of [the CAA]," the Administrator, within forty-five days of receiving the proposed permit, "shall . . . object to its issuance." 42 U.S.C. § 7661d(b)(1).

If the EPA does not object to the permit within this time frame, however, "any person" may petition the Administrator to make an objection within sixty days after the expiration of EPA's period of review. *Id.* § 7661d(b)(2). The petition must be based on objections that were made "with reasonable specificity during the public comment period" on the draft permit. *Id.* "[I]f the petitioner demonstrates to the Administrator that the permit is not in compliance with the requirements of [the CAA]," Title V provides that the Administrator "shall issue an objection . . . ." *Id.* If EPA does object to a permit, "the permitting authority may not issue the permit unless it is revised" to meet the objection. *Id.* §§ 7661d(b)(3), (c).

## C. Aggregation

Here, MacClarence petitioned for an objection pursuant to § 7661d(b)(2), arguing that the permit did not comply with the CAA because ADEC, in the final draft permit for GC 1, had not properly "aggregated" stationary sources of air pollution in the PBU. Title V and other CAA provisions, such as the "prevention of significant deterioration" (PSD) requirements, 42 U.S.C. §§ 7470-79, apply to certain "stationary sources" of air pollution. In some cases, several discrete stationary sources may be required to be aggregated into one single stationary source for purposes of compliance with these provisions.[2] For example, as noted above, Title V requires every "major source" of air pollution to obtain a permit. 42 U.S.C. § 7661a(a). The Title V regulations, in turn, define "major source" as a "stationary source (*or any group of stationary sources* that are located on one or more contiguous or adjacent properties, and are under common control of the same person (or persons under common control)) belonging to a single major industrial grouping . . . ." 40 C.F.R. § 70.2 (emphasis added).

---

[2]In making "stationary source" determinations, ADEC looks to the definitions of "stationary source" outlined in the federal PSD and Title V regulations. *See* Alaska Stat. § 46.14.990(26) (citing 40 C.F.R. 51.116(b) (PSD requirements) and 40 C.F.R. § 70.2 (Title V requirements)).

Similarly, the PSD requirements, which "ensure that the air quality in attainment areas or areas that are already 'clean' will not degrade," *Alaska Dep't of Envtl. Conservation v. EPA*, 540 U.S. 461, 470 (2004) (quoting R. Belden, *Clean Air Act* 43 (2001)), may require the aggregation of stationary sources. Under the PSD requirements, "major stationary sources" may not be constructed or modified in a significant way "unless a permit prescribing emission limitations has been issued for the facility." *Id.* at 472 (citing 42 U.S.C. §§ 7475(a)(1), 7479(2)(C)). A "major stationary source," for PSD purposes, is a "stationary source" that emits or has the potential to emit a certain quantity of pollutants. 42 U.S.C. §§ 7479(1), 7602(j). In turn, a "stationary source" is "any building, structure, facility, or installation which emits or may emit a regulated . . . pollutant." 40 C.F.R. § 51.166(b)(5). The regulations define "[b]uilding, structure, facility, or installation" as "all of the pollutant-emitting activities which belong to the same industrial grouping, are located on one or more contiguous or adjacent properties, and are under the control of the same person . . . ." *Id.* § 51.166(b)(6).

As the record for this case reveals, the aggregation of pollutant-emitting activities for the purposes of designating a "major source" or "major stationary source" is not a clear-cut task. Under the governing regulations, however, determinations regarding "major sources" for purposes of issuing Title V permits and "major stationary sources" for purposes of meeting PSD requirements involve the same analysis; the aggregated sources must belong to the same industrial grouping, be located on continuous or adjacent properties, and be under common control. *See* 40 C.F.R. §§ 51.166(b)(6), 70.2. Over the years, EPA has provided some guidance on the aggregation of pollutant-emitting activities and the designation of "major sources" and "major stationary sources." When EPA promulgated regulations for the PSD program in 1980, it noted that a "stationary source" should reflect "a common sense notion of 'plant.' " 45 Fed. Reg. 52,676, 52,694-95 (Aug. 7, 1980). EPA has also issued memoranda in order to

provide regional EPA administrators and state permitting authorities with guidance in applying aggregation principles to designate stationary sources. *See, e.g.*, Memorandum from Acting Assistant Administrator, EPA, to Regional EPA Administrators, Source Determinations for Oil and Gas Industries (Jan. 12, 2007), EPA docket EPA-HQ-OAR-2007-0629-0001.pdf, http://www.regulations.gov/search/Regs/content Streamer?objectId=0900006480269a33&disposition= attachment&contentType=pdf (withdrawn by Gina McCarthy, Assistant Administrator, EPA, to Regional EPA Administrators, Withdrawal of Source Determinations for Oil and Gas Industries (September 22, 2009), EPA docket EPA-HQ-OAR-2007-0629-0003.pdf, http://www.regulations.gov/search/Regs/contentStreamer?objectId=0900006480a3309c& disposition=attachment&contentType=pdf); Letter from Director, Air Program, EPA, to Utah Division of Air Quality, Response to Request for Guidance in Defining Adjacent with Respect to Source Aggregation (May 21, 1998), http://www.epa.gov/region07/programs/artd/air/title5/t5memos/util-trl.pdf.

### D.   The Permitting Process for GC 1

With this statutory and regulatory framework in mind, we turn to the permitting process for GC 1. In 1997, ARCO, then the owner of GC 1, applied to ADEC for a Title V permit. ADEC prepared a draft permit and submitted it for public comment on February 22, 2002. This initial draft permit did not aggregate GC 1 with any other potential pollutant-emitting sources in the PBU. The following month, MacClarence submitted comments on the draft permit, arguing that "[a]ll BP units within the Prudhoe Bay Facility" should be aggregated in such a way that the Title V permit applied to the PBU as a whole, rather than just GC 1. In April 2002, the Pacific Northwest Regional Office of the EPA (EPA Region 10) also submitted "preliminary comments" to ADEC regarding the GC 1 draft permit. Echoing MacClarence's concerns, EPA stated,

[A]bsent a contrary rationale, it is EPA's position that the BP GC 1 facility is part of the larger source consisting of all BP units within the Prudhoe Bay . . . . [T]he BP facilities are interdependent, located on adjacent properties, and are owned or operated by the same person under common control.

ADEC revised the draft permit and submitted a new draft permit for public comment in March 2003. ADEC again proposed to extend coverage of the operations permitted under Title V only to GC 1. Significantly, however, ADEC also proposed a condition that would require BP to aggregate all of the pollutant-emitting sources within the PBU "for the purpose of determining applicability with the modification requirements of [Alaska's approved PSD program]." The revised permit's Statement of Basis explained in detail why the PBU in its entirety should be considered a "major stationary source," referencing CAA provisions and EPA guidance on aggregation, and used diagrams to depict the interconnectedness of the various pollutant-emitting sources within the PBU. ADEC concluded by stating that "[t]he individual facilities at the Prudhoe Bay Unit act as a single integrated production facility for the purpose of delivering crude oil to the Trans Alaska Pipeline System . . . ."

In response to the March 2003 draft permit, BP submitted comments requesting that aggregation conditions be completely eliminated from the permit. Shortly thereafter, in July 2003, ADEC reversed course and issued a proposed permit that, like the initial draft permit, did not aggregate GC 1 with any other PBU facilities. In August 2003, EPA responded to this proposed permit by requesting that ADEC

postpone issuing draft, proposed and final Title V permits for those North Slope operations which raise aggregation issues until the agencies have come to a mutual understanding on an over-arching approach to the issue or until either agency has advised the

> other that it has decided to forego further attempts to reach a mutual understanding.

BP was included in ADEC's and EPA's ensuing conversations regarding aggregation of pollutant-emitting sources in the North Slope.

In October 2003, after these discussions concluded, ADEC issued a new draft permit that employed a "hub-and-spoke" aggregation model. Under this model, ADEC aggregated GC 1 with the well pads that supply it with three-phase crude oil for purposes of Title V and for the PSD requirements. The draft permit, however, did not aggregate GC 1 with the rest of the PBU facilities as had been requested by MacClarence in his March 2002 comments. In a Statement of Basis for "Revision 1," discussed *infra*, ADEC explained that it rejected aggregation of the entire PBU facilities because, among other things (1) the PBU covers roughly 300 square miles and therefore aggregation "stretches the concept of proximity" that underlies aggregation determinations; (2) "[t]he complexity of administering . . . and operating . . . a stationary source as large as the PBU without clear corresponding environmental benefit argues against" aggregation of the entire PBU; and (3) "there [was] no precedent for defining such a large stationary source . . . ."

When the EPA, in February 2004, did not object to this permit under 42 U.S.C. § 7661d(b), MacClarence petitioned the EPA Administrator to object to the permit. This petition, like MacClarence's March 2002 comments, argued that the permit violated the CAA because it did not aggregate all of the pollutant-emitting sources in the PBU into one stationary source. MacClarence attached to the petition his 2002 comments, ADEC's March 2003 Statement of Basis, and EPA's August 2003 letter to ADEC requesting a postponement of ADEC's issuance of any permits involving aggregation issues in the North Slope.

After MacClarence submitted his petition, EPA notified him that ADEC had issued a revision to the final permit, "Revision 1." Revision 1, among other things, "added to the permit itself the definition of the title V source, which was previously only in the statement of basis" and "made minor changes to the aggregation discussion in the statement of basis." Pursuant to EPA's request, MacClarence refiled his petition for an objection to the permit on April 14, 2004.[3] He resubmitted his original petition with a cover letter stating that his petition remained unchanged as Revision 1 did not address his concerns and did not explain ADEC's decision to reverse course from its March 2003 draft permit that required aggregation.

The Administrator denied MacClarence's request for an objection on April 20, 2007.[4] MacClarence timely petitioned this court for review of EPA's denial of his request for an objection.

## II.   Discussion

In considering MacClarence's petition for review, we do not decide whether MacClarence's substantive argument— that the CAA requires all pollutant-emitting sources in the PBU to be aggregated for purposes of Title V and other substantive CAA provisions—is correct. Rather, we consider

---

[3]Revision 1 was the version of the final permit to which MacClarence responded in his petition to the EPA Administrator. Alaska Department of Environmental Conservation Air Quality Operating/Construction Permit, Permit No. 182TVP01 (Feb. 17, 2004) ("Revision 1"), http:// www.dec.state.ak.us/air/ap/docs/182tvp01r1.pdf. ADEC, however, revised the permit yet again in August 2005, "Revision 2". Because MacClarence petitioned for an objection prior to Revision 2, any future references to "the final permit," or its Statement of Basis, are to the final permit as modified by Revision 1.

[4]MacClarence does not challenge EPA's unexplained failure to respond to his petition within the sixty-day period required by statute. *See* 42 U.S.C. § 7661d(b)(2).

only whether the EPA Administrator erred in determining that MacClarence failed to demonstrate, pursuant to 42 U.S.C. § 7661d(b)(2), that the final Title V permit for GC 1 did not comply with the CAA.

In denying MacClarence's request, the Administrator reasoned that MacClarence (1) "failed to provide adequate information to support his claim that the entire PBU should be aggregated," and (2) "failed to demonstrate that the failure to aggregate all facilities within the PBU has led to a deficiency in the content of the permit." Because we conclude that we may properly uphold the Administrator's denial of MacClarence's petition on the basis of the first ground, we need not reach the second.

### A. Standard of Review

Our review of the "the reasonableness of [the Administrator's] decision-making processes" in denying MacClarence's petition is governed by the Administrative Procedure Act (APA). *CHW W. Bay v. Thompson*, 246 F.3d 1218, 1226 (9th Cir. 2001) (citing *Transitional Learning Comm. at Galveston, Inc. v. U.S. Office of Pers. Mgmt.*, 220 F.3d 427, 430 n.2 (5th Cir. 2000)); *see Sierra Club v. EPA*, 346 F.3d 955, 961 (9th Cir. 2003). Under the APA, we may only set aside an agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). We review the Administrator's interpretation of 42 U.S.C. § 7661d(b)(2), as expressed in its order denying MacClarence's petition, under the principles set forth in *Chevron USA Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984). *De Jesus Ramirez-Zavala v. Ashcroft*, 336 F.3d 872, 875 (9th Cir. 2003).

### B. MacClarence's Petition

[1] This petition for review requires us, for the first time, to consider a petitioner's burden under 42 U.S.C.

§ 7661d(b)(2) to "demonstrate[ ] to the Administrator that [a Title V] permit is not in compliance with the requirements of [the CAA]." § 7661d(b)(2). Specifically, we must determine whether the Administrator's interpretation of the word "demonstrate," as expressed in his order denying MacClarence's petition, was a permissible construction of § 7661d(b)(2), and whether the Administrator's application of § 7661d(b)(2) to the petition was arbitrary and capricious.

*Chevron* provides the guiding principles for according deference to an agency's interpretation of a statute it administers. *See* 467 U.S. at 842. Here, it is undisputed that EPA is tasked with the administration of the CAA. Therefore, we first decide "whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear . . . the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842-43. If, however, the statute is ambiguous, "*Chevron* deference applies, 'when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority.' " *Nw. Ecosystem Alliance v. United States Fish & Wildlife Serv.*, 475 F.3d 1136, 1141 (9th Cir. 2007) (quoting *United States v. Mead Corp.*, 533 U.S. 218, 226-27 (2001)). Under *Chevron* deference, the agency's interpretation is valid so long as it "is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843. When *Chevron* deference does not apply, we are guided by the principles of *Skidmore v. Swift*, 323 U.S. 134 (1944); "[t]he 'fair measure of deference' may then range from 'great respect' to 'near indifference,' depending on 'the degree of the agency's care, its consistency, formality, and relative expertness, and . . . the persuasiveness of the agency's position.' " *Nw. Ecosystems Alliance*, 475 F.3d at 1141 (quoting *Mead*, 533 U.S. at 228).

**[2]** Several of our sister circuits have concluded that the word "demonstrate" in § 7661d(b)(2) is an ambiguous term.

*See Sierra Club v. EPA*, 557 F.3d 401, 406 (6th Cir. 2009); *Sierra Club v. Johnson (Sierra Club II)*, 541 F.3d 1257, 1266 (11th Cir. 2008); *Citizens Against Ruining the Environment v. EPA*, 535 F.3d 670, 677-78 (7th Cir. 2008); *N.Y. Pub. Interest Research Group v. Johnson ("NYPIRG II")*, 427 F.3d 172, 179 (2d Cir. 2005). We agree. The word "demonstrate" may mean variously, to "point out;" "to manifest clearly, certainly, or unmistakably;" or "to make evident or reveal as true by reasoning processes, concrete facts and evidence, experimentation, operation, or repeated examples." *Webster's Third New International Dictionary* 600 (1993). As the Eleventh Circuit pointed out in *Sierra Club II*, the plain meaning of the term "demonstrate" in § 7661d(b)(2) "does not resolve important questions that are part and parcel of the Administrator's duty to evaluate the sufficiency of a petition, for example, the type of evidence a petitioner may present and the burden of proof guiding the Administrator's evaluation of when a sufficient demonstration has occurred." 541 F.3d at 1266. The ambiguity of this provision in the statute suggests that Congress has left the meaning of "demonstrate" open for EPA to supply a reasonable interpretation under *Chevron*. *See NYPIRG I*, 321 F.3d at 333 n.11 ("There clearly is *some* room for the exercise of agency expertise in [§ 7661d(b)(2)] . . . .").

**[3]** Whether we defer to the Administrator's interpretation of "demonstrate" under *Chevron*'s reasonableness standard or *Skidmore*'s persuasiveness standard, nothing in the Administrator's order denying MacClarence's petition qualifies as an impermissible interpretation of his burden under § 7661d(b)(2). The Administrator denied MacClarence's petition, in part, because MacClarence "failed to provide adequate information to support his claim that the entire PBU should be aggregated . . . ." Specifically, he noted that MacClarence "ma[d]e only generalized statements that all facilities in the PBU must be aggregated and d[id] not provide adequate references, legal analysis, or evidence in support of these general assertions."

**[4]** This construction of MacClarence's burden under § 7661d(b)(2) is both reasonable and persuasive, and is consistent with our common understanding of the word "demonstrate." The Administrator's expectation that MacClarence provide "references, legal analysis, or evidence" comports with Webster's definition of "demonstrate"—"to make evident or reveal as true by reasoning processes, concrete facts and evidence, experimentation, operation, or repeated examples." *New International Dictionary*, *supra*, at 600. Further, the Administrator's interpretation is consistent with § 7661d(b)(2) as a whole, which mandates that the Administrator "shall issue an objection" to the permit with which the permitting authority must comply, should a petitioner satisfy his burden under the statute. *See Sierra Club v. Johnson (Sierra Club I)*, 436 F.3d 1269, 1280 (11th Cir. 2006) (quoting 42 U.S.C. § 7661d(b)(2)) (holding that the Administrator's duty to object to a permit once a petitioner demonstrates that it does not comply with the CAA is mandatory, not discretionary); *NYPIRG I*, 321 F.3d at 333 (same). Because a petition that properly demonstrates that a permit is not in compliance with the CAA requires the Administrator and state permitting authority to take certain action, the Administrator's requirement that MacClarence support his allegations with legal reasoning, evidence, and references is reasonable and persuasive.

**[5]** Thus, the Administrator's conclusion that MacClarence "failed to provide adequate information to support his claim that the entire PBU should be aggregated" was not arbitrary or capricious. The success of MacClarence's petition turned on his argument that aggregation of the entire PBU pollutant-emitting sources was necessary for the permit to comply with the CAA and that the final aggregation decision — the hub-and-spoke model — did not comply with the CAA. Rather than offering a reasoned analysis of why the entire PBU should be aggregated or of the deficiencies in the hub-and-spoke model, MacClarence merely stated in his petition:

As reinforced by ADEC's original analysis, shown at Attachment 2, the March 7, 2003 version of this permit complies with all federal requirements for source aggregation. ADEC's rationale for requiring aggregation is based on EPA directives. By contrast, the permit decisions referenced in the final permit are at variance with your agency's own guidance.

Although MacClarence's March 2002 comments and ADEC's March 2003 Statement of Basis, which were attached to the petition, provided an explanation of why aggregation of the entire PBU pollutant-emitting sources was necessary to comply with the CAA, he merely alleged that the final aggregation decision, the hub-and-spoke model, was "at variance with [EPA's] own guidance."[5] Neither MacClarence's petition nor the documents attached to the petition address EPA guidance memoranda or directives with which the hub-and-spoke model conflicted or explained how the hub-and-spoke model contravened such guidance or the CAA.[6]

At the end of his petition, MacClarence did challenge ADEC's reliance on permit decisions by other states to support its final aggregation decision. His brief discussion of these references, however, noted only that the facilities at issue in those other permit decisions were dissimilar to the PBU, and at best, showed that those permit decisions did not support ADEC's decision to adopt a hub-and-spoke aggregation model. MacClarence made no attempt to show that the

---

[5]MacClarence argues that the Administrator did not consider the documents he attached to his petition in evaluating his arguments and thus prohibited him from "incorporating by reference" arguments and other information. In light of the Administrator's statement that he considered "available information, including . . . information provided by the Petitioner in his petition," we are not persuaded by this argument.

[6]MacClarence's attempt to challenge the merits of the hub-and-spoke aggregation model before this court are unavailing. Our review is limited to the record before the Administrator. *Asarco, Inc. v. EPA*, 616 F.2d 1153, 1158-60 (9th Cir. 1980).

hub-and-spoke model was at "variance" with the CAA or any other EPA guidance.

MacClarence also argues that the Administrator improperly faulted him for failing to challenge the reasonableness of ADEC's Statement of Basis for the final permit. In denying MacClarence's petition, the Administrator stated that Mac-Clarence "does not provide any argument as to why ADEC's decision not to aggregate [the entire PBU], which is described in great detail in the Statement of Basis for the *final* Revision 1 permit, is unreasonable." MacClarence argues that this statement reflects an improper interpretation of his burden under § 7661d(b)(2) by requiring him to show the "unreasonableness" of ADEC's rationale for employing the hub-and-spoke model in the final permit, rather than the final permit's noncompliance with the CAA.

[6] We reject this argument. The Administrator's order denying MacClarence's petition properly sets forth MacClarence's burden under § 7661d(b)(2), stating that "[t]o justify exercise of an objection by EPA to a title V permit pursuant to [§ 7661d(b)(2)], a petitioner must demonstrate that the permit is not in compliance with the requirements of the CAA" and later concluding that "the general allegations of the Petitioner in the April 2004 Petition . . . fail to demonstrate a basis for Petitioner's claim that Revision 1 to the GC 1 Permit violates the CAA . . . ." In light of the Administrator's proper recitation of MacClarence's burden, we view the Administrator's statement that MacClarence should have shown that ADEC's explanation for its aggregation decision was unreasonable, as requiring MacClarence to challenge the basis or reasons for ADEC's final decision and to demonstrate that the permit did not comply with the CAA. We see nothing wrong with the Administrator's expectation that MacClarence needed to challenge this reasoning. MacClarence's petition relied on ADEC's March 2003 Statement of Basis. ADEC, however, rejected the aggregation decisions reflected in that Statement of Basis and explained why it did so in the new

Statement of Basis for the final permit. The Administrator reasonably expected MacClarence to challenge that explanation.

[7] Further, the Administrator's conclusion that MacClarence did not challenge ADEC's reasoning for the final permit was not arbitrary or capricious. ADEC's final Statement of Basis explained how the hub-and-spoke aggregation model complied with the CAA, why complete aggregation of the facilities in the PBU was impractical and unprecedented, and why the hub-and-spoke model was a better alternative than complete aggregation. Although MacClarence asserted in his petition that the out-of-state permit decisions cited by ADEC did not support its final aggregation decision, his petition failed to demonstrate that the hub-and-spoke aggregation model did not comply with the CAA. More importantly, MacClarence failed to challenge ADEC's reasoning that "[t]he complexity of administering . . . and operating . . . a stationary source as large as the PBU without clear corresponding environmental benefit argues against [the aggregation of the entire PBU]."

Therefore, we conclude that the Administrator's determination that MacClarence did not demonstrate that the entire PBU should be aggregated did not constitute an impermissible interpretation of MacClarence's burden under 42 U.S.C. § 7661d(b)(2), to "demonstrate" that ADEC's final Title V permit for BP's GC 1 did not comply with the CAA, nor was it arbitrary or capricious.

**PETITION DENIED.**