# United States Court of Appeals
## For the Eighth Circuit

_____

No. 21-1970
_____

Casey Voigt; Julie Voigt

*Petitioners*

v.

U.S. Environmental Protection Agency; Michael S. Regan, Administrator, U.S. Environmental Protection Agency

*Respondents*

Montana-Dakota Utilities Company; Northern Municipal Power Agency; Northwestern Corporation, doing business as NorthWestern Energy; Otter Tail Power Company

*Intervenors*

------------------------------

State of North Dakota

*Amicus on Behalf of Respondent*

_____

Petition for Review of an Order of the
Environmental Protection Agency

_____

Submitted: March 2, 2022
Filed: August 31, 2022

_____

Before LOKEN, COLLOTON, and SHEPHERD, Circuit Judges.
_____

SHEPHERD, Circuit Judge.

Casey and Julie Voigt, the owners of a large ranch in rural North Dakota, filed this petition for review related to their challenge of the Environmental Protection Agency's (EPA) renewal of a Clean Air Act (CAA) Title V operating permit for Coyote Station, a coal-fired electric generating plant that is serviced by the nearby Coyote Creek Mine. The Voigts petitioned the EPA Administrator to object to the renewal of the permit, and the Administrator denied the petition on the basis that the Voigts failed to carry their burden of demonstrating that the permitting decision was contrary to the CAA. The Voigts now seek our review of the Administrator's denial of their petition for an objection. For the following reasons, we deny the petition for review.

I.

We begin with the background regarding Title V operating permits. After originally enacting what is known as the CAA in 1963, see Dep't of Transp. v. Pub. Citizen, 541 U.S. 752, 758 (2004), Congress amended the CAA in 1990 to add the Title V permitting requirement that forms the basis of this dispute. Nucor Steel-Ark. v. Big River Steel, LLC, 825 F.3d 444, 447 (8th Cir. 2016). Under this requirement, "each covered facility [must] obtain a comprehensive operating permit setting forth all CAA standards applicable to that facility. These 'Title V' permits do not generally impose any new emission limits, but are simply intended to incorporate into a single document all of the CAA requirements governing a facility." Sierra Club v. Otter Tail Power Co., 615 F.3d 1008, 1012 (8th Cir. 2010) (citation omitted). "[S]tates issue the Title V permits to qualifying facilities." Nucor, 825 F.3d at 447. The EPA approved North Dakota's operating permit program in 1999, see Clean Air Act Full Approval of Operating Permit Program; State of North Dakota, 64 Fed. Reg. 32,433 (June 17, 1999), and the North Dakota Department of Health

(NDDOH)[1] is the primary permitting authority that is responsible for administering and enforcing Title V.  See N.D. Admin. Code § 33.1-15-14-01 et seq.

Under North Dakota's rules for Title V permits, a major stationary source operating within the state must obtain a Title V permit from the NDDOH.  North Dakota defines a "major source" as, in part:

> any stationary source (or any group of stationary sources that are located on one or more contiguous or adjacent properties, and are under common control of the same person (or persons under common control)) belonging to a single major industrial grouping . . . .

N.D. Admin. Code § 33.1-15-14-06(1)(q).  Thus, a group of stationary sources is considered a single major source for purposes of Title V permitting if they are (1) located on contiguous or adjacent properties; (2) under common control; and (3) of the same industrial grouping.  No state or federal regulation defines the term "common control."

To obtain or renew a permit, a party must submit to the NDDOH, which then must submit to the EPA Administrator, "a copy of each permit application (and any application for a permit modification or renewal) or such portion thereof, including any compliance plan, as the Administrator may require to effectively review the application and otherwise to carry out the Administrator's responsibilities under this chapter," as well as "a copy of each permit proposed to be issued and issued as a final permit."  42 U.S.C. § 7661d(a)(1); see also 40 C.F.R. § 70.8(a)(1).  "[A]ll permit proceedings, including initial permit issuance, significant modifications, and renewals, shall provide adequate procedures for public notice including offering an

---

[1]"In 2017, the North Dakota state legislature created a new State Department of Environmental Quality (NDDEQ) that assumed all the duties and responsibilities of the NDD[O]H's Environmental Health Section."  Air Plan Approval; North Dakota; Removal of Exemptions to Visible Air Emissions Restrictions, 87 Fed. Reg. 47,101-01 n.1 (Aug. 2, 2022).  For consistency, we use NDDOH to refer to both names of the permitting authority.

opportunity for public comment and a hearing on the draft permit." 40 C.F.R. § 70.7(h).

As part of the Administrator's review of a proposed Title V permit, if the Administrator determines that an application or requested permit is not compliant with the applicable requirements of the CAA, "the Administrator shall, in accordance with this subsection, object to [the permit's] issuance." 42 U.S.C. § 7661d(b); see also 40 C.F.R. § 70.8(c). If the Administrator objects within 45 days of receiving a copy of the proposed permit, "[t]he permitting authority shall respond in writing" to the Administrator's objection. 42 U.S.C. § 7661d(b)(1); see also 40 C.F.R. § 70.8(c). Where the Administrator does not object, the CAA provides an avenue for individuals to nonetheless petition the Administrator to object, provided that they do so within 60 days after the expiration of the Administrator's 45-day review period. 42 U.S.C. § 7661d(b)(2); 40 C.F.R. § 70.8(d). Regarding the contents of an individual's petition, it

> shall be based only on objections to the permit that were raised with reasonable specificity during the public comment period provided by the permitting agency (unless the petitioner demonstrates in the petition to the Administrator that it was impracticable to raise such objections within such period or unless the grounds for such objection arose after such period). The petition shall identify all such objections.

Id. Further,

> [u]nless the grounds for the objection arose after the public comment period or it was impracticable to raise the objection within that period . . . , the petition must identify where the permitting authority responded to the public comment, including page number(s) in the publicly available written response to comment, and explain how the permitting authority's response to the comment is inadequate to address the issue raised in the public comment. If the response to comment document does not address the public comment at all, the petition must state that.

-4-

40 C.F.R. § 70.12(a)(2)(vi). Within 60 days of an individual's petition to the Administrator, "[t]he Administrator shall issue an objection . . . if the petitioner demonstrates to the Administrator that the permit is not in compliance" with the applicable CAA requirements. 42 U.S.C. § 7661d(b)(2).

Coyote Station, which is subject to Title V permitting requirements, is a lignite coal-fired power plant located in Mercer County, North Dakota. Operational since 1981, Coyote Station has received all of its coal from the nearby Coyote Creek Mine since 2016. Large parts of the Coyote Creek Mine are located on property leased to Coyote Creek Mining Company by the Voigts. Coyote Station is the mine's sole customer; the mine transports coal to Coyote Station via a conveyor belt that runs between the two facilities. Coyote Station is located approximately five miles from the Voigts' home and approximately one mile from part of the Voigts' ranch. Since 1998, Coyote Station has operated under a Title V permit.

On September 28, 2017, Coyote Station applied to renew its permit. This was the first time Coyote Station sought to renew its permit since Coyote Creek Mine became operational and began supplying Coyote Station with all of its coal needs. The NDDOH published a draft permit for public comment on June 12, 2018, with the comment period running through July 2018. On July 21, 2018, the Voigts submitted public comments, arguing that the draft permit was not CAA-compliant because Coyote Creek Mine and its emissions were excluded from the permit. The Voigts asserted that the mine and the power station should be considered a single source for purposes of the Title V permit, which would result in the imposition of specific emission limits on the mine that otherwise would not be required. The Voigts' argument was premised on the assertion that Coyote Creek Mine and Coyote Station are facilities under common control because Coyote Station exerts complete control over the Coyote Creek Mine through the terms of their Lignite Sales Agreement and has complete physical control over the conveyor belt that runs between the two facilities. After receiving the Voigts' comments, on October 2, 2018, the NDDOH sent the proposed permit to the EPA for review pursuant to 42 U.S.C. § 7661d(a) and 40 C.F.R. § 70.8(a), specifically seeking the EPA's position

on whether Coyote Creek Mine and Coyote Station are a single source for Title V permitting purposes. On November 14, 2018, the EPA responded, recommending to the NDDOH that it more fully develop the record regarding the issue of common control.

On January 15, 2019, the Voigts filed a petition with the Administrator, pursuant to 42 U.S.C. § 7661d(b)(2) and 40 C.F.R. § 70.8(d), asking him to object to the issuance of the proposed permit, again arguing that, under the common control element, the mine and power plant should be considered a single source. On March 11, 2019, the NDDOH withdrew that proposed permit for the stated purpose of "complet[ing] the permit record by addressing any applicable comments received during the public comment period." Then, on April 2, 2020, the NDDOH responded to the Voigts' comment submitted in July 2018. The response, from NDDOH environmental engineers, stated that the Voigts' comments were not relevant because, by asking the NDDOH to consider Coyote Station and Coyote Creek Mine a single source, they asked the NDDOH to reconsider previous preconstruction permitting decisions, which is outside the purview of a Title V permitting process. Regardless, the response stated that, even if the Voigts' comments were relevant, the NDDOH had previously re-evaluated its preconstruction permitting decision and confirmed its determination that Coyote Station and Coyote Creek Mine are separate sources. The response also included, as an attachment, a four-page "Stationary Source Determination" memo, also dated April 2, 2020, from the same NDDOH environmental engineers to Coyote Station and Coyote Creek Mine. This memo specifically concluded that Coyote Station and Coyote Creek Mine are not under common control and thus are not a single source for the purposes of Title V permitting. On April 6, 2020, the NDDOH again sent the EPA the proposed permit for review pursuant to 42 U.S.C. § 7661d(a) and 40 C.F.R. § 70.8(a), but it did not publish the proposed permit for a public notice and comment period as it had done the first time. The NDDOH did not make any amendments to the permit when it resubmitted it to the EPA and included in the associated materials the four-page Stationary Source Determination memo. The Administrator did not object to the

proposed permit, and on May 27, 2020, the NDDOH issued the permit to Coyote Station.

On July 23, 2020, the Voigts submitted another petition asking the Administrator to object to the permit, again pursuant to 42 U.S.C. § 7661d(b)(2) and 40 C.F.R. § 70.8(d). The Voigts reasserted their position that Coyote Station and Coyote Creek Mine are a single source, repeating verbatim their argument regarding common control from the 2019 petition. The only portion of the 2020 petition that substantively addressed the Stationary Source Determination memo was a single sentence included in the background section, which stated, "This stationary source determination cherry-picked parts of the [Lignite Sales Agreement] and ignored almost all of the provisions cited by the Voigts herein."

On January 15, 2021, the EPA Administrator issued an order addressing both the Voigts' 2019 and 2020 petitions. First, the Administrator denied the 2019 petition as moot due to the NDDOH's withdrawal of the proposed permit. Next, the Administrator denied the Voigts' 2020 petition because the Voigts failed to meet their burden of demonstrating that Coyote Station and Coyote Creek Mine are a single source, and thus failed to demonstrate that the proposed permit did not comply with the CAA. In reaching this conclusion, the Administrator first noted that source determinations require highly fact-specific analyses, and the EPA does not substitute its judgment for that of the permitting authority. The Administrator then stated that due to the lack of any definition of or particular framework for evaluating common control, the most pertinent source of information was the decision of the NDDOH, represented in the Stationary Source Determination memo. The Administrator then stated that the Voigts did not attempt to rebut any of the reasoning in the memo before concluding that, because the Voigts failed "to engage with the facts that the [NDDOH] deemed to be most relevant, the [Voigts] . . . failed to demonstrate that [the NDDOH's] justification was unreasonable, or that its ultimate decision was contrary to the CAA." In closing, the Administrator noted that the decision to deny the 2020 petition was based on the Voigts' failure to carry their burden and that the decision should not be read as reflecting agreement with the NDDOH's reasoning.

After the denial of their petitions to the Administrator, the Voigts filed this petition for review, asking this Court to vacate the Administrator's order.

II.

The Voigts argue that the Administrator's order should be vacated because the order was arbitrary and capricious and not in accordance with the law. Specifically, the Voigts assert that they demonstrated that Coyote Station and Coyote Creek Mine are under common control, that the Administrator erroneously concluded that the Voigts were required to respond to the revisions from the NDDOH, for which there was no public notice and comment period, and that the Administrator erroneously relied on comments submitted by the NDDOH after the Voigts filed their 2020 petition. The CAA provides a cause of action under 42 U.S.C. § 7661d(b)(2), which allows a party to seek federal appellate review of a final order of the EPA on a petition for an objection to a permit under Title V. "Because the [CAA] itself does not specify a standard for judicial review in this instance, we apply the . . . default standard of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), and ask whether the Agency's action was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" Alaska Dep't of Env't Conservation v. E.P.A., 540 U.S. 461, 496-97 (2004) (footnote omitted). Under this standard, "[e]ven when an agency explains its decision with 'less than ideal clarity,' a reviewing court will not upset the decision on that account 'if the agency's path may reasonably be discerned.'" Id. at 497 (citation omitted).

The Voigts' contentions are largely premised on the proper interpretation of the term "demonstrates" in 42 U.S.C. § 7661d(b)(2) because the Administrator concluded that where the Voigts failed "to engage with the facts that [the NDDOH] deemed to be most relevant, the [Voigts] . . . failed to demonstrate that [the NDDOH's] justification was unreasonable, or that its ultimate decision was contrary to the CAA." In reviewing an agency's determination, we apply the "familiar two-step framework" from Chevron U.S.A., Inc. v. Natural Resources Defense Council, 467 U.S. 837 (1984). Andrade-Zamora v. Lynch, 814 F.3d 945, 951 (8th Cir. 2016).

Under this framework, we first consider whether "Congress has unambiguously spoken to the question at issue" by "us[ing] traditional tools of statutory construction." Id. "If the statute is unambiguous, we simply apply the statute. If the statute is ambiguous, we proceed to the second step of Chevron and apply the agency's interpretation if it 'is based on a permissible construction of the statute.'" Id. (citations omitted). Further, "[e]ven if Chevron deference is inappropriate," an agency's interpretation may "nevertheless be eligible for a lesser form of deference under Skidmore v. Swift & Co., 323 U.S. 134 (1944)." Godinez-Arroyo v. Mukasey, 540 F.3d 848, 850 (8th Cir. 2008). Under Skidmore, "[w]e consider that the rulings [and] interpretations . . . of [an agency], while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." 323 U.S. at 140.

Section 7661d(b)(2) requires a petition for an objection to "demonstrate[] to the Administrator that the [proposed] permit is not in compliance with the requirements of [the CAA]," and several circuits "have concluded that the word 'demonstrate' in § 7661d(b)(2) is an ambiguous term." MacClarence v. E.P.A., 596 F.3d 1123, 1130 (9th Cir. 2010) (first and second alterations in original). We agree with these circuits because neither the CAA nor its regulations defines demonstrate or "give[s] context to how the Administrator should make this judgment" and "the plain meaning of the word 'demonstrate,' which is 'to show clearly' or 'to prove or make clear by reasoning or evidence,' does not resolve important questions that are part and parcel of the Administrator's duty to evaluate the sufficiency of a petition." Sierra Club v. Johnson, 541 F.3d 1257, 1266 (11th Cir. 2008) (quoting Merriam–Webster's Collegiate Dictionary 308 (10th ed.1999)); see also Sierra Club v. E.P.A., 557 F.3d 401, 406 (6th Cir. 2009) ("That the petitioners must demonstrate these things to the EPA suggests a role for the agency's expertise and judgment to play. But how widely that discretion ranges and what role, if any, the EPA's prior allegations play in the equation are left unspecified. The terms of [§ 7661d(b)(2)] do not directly answer this question. Context does not clear things up. . . . That leaves us with an ambiguous provision, one that Chevron empowers the agency to interpret definitively so long as it does so reasonably." (emphasis omitted) (citations

omitted)); <u>Citizens Against Ruining the Env't v. E.P.A.</u>, 535 F.3d 670, 677-78 (7th Cir. 2008) ("[N]either the CAA nor its regulations define the term 'demonstrates' [in § 7661d(b)(2)]. Thus, the EPA has discretion under the statute to determine what a petition must show in order to make an adequate 'demonstration.' . . . [B]ecause 'demonstrate' is undefined, we need only determine whether the Administrator's interpretation is 'based on a permissible construction of the statute.'" (citations omitted)); <u>N.Y. Pub. Int. Rsch. Grp., Inc. v. Johnson</u>, 427 F.3d 172, 179 (2d Cir. 2005) ("We now turn to the EPA's preliminary question "'whether the petition demonstrates non-compliance,' and look at whether a reasonable agency resolution of that question deserves <u>Chevron</u> deference.").

In response to the Voigts' petition, the EPA has interpreted the term "demonstrates" in § 7661d(b)(2) to include an obligation to discuss the specific points in the NDDOH permit or reasoning to which the Voigts objected. Specifically, the Administrator stated that the Voigts' only mention of the NDDOH permitting decision in their 2020 petition was in the background section of the petition and stated only: "This stationary source determination cherry-picked parts of the [Lignite Sales Agreement] and ignored almost all the provisions cited by the Voigts herein." The Administrator determined that because the Voigts failed "to engage with the facts that [the NDDOH] deemed to be most relevant, the [Voigts] . . . failed to demonstrate that [the NDDOH's] justification was unreasonable, or that its ultimate decision was contrary to the CAA." We conclude that this interpretation is entitled to deference under either <u>Chevron</u> or <u>Skidmore</u>, because it is both reasonable and persuasive, a conclusion other courts have similarly reached. <u>See, e.g.</u>, <u>MacClarence</u>, 596 F.3d at 1131 ("Whether we defer to the Administrator's interpretation of 'demonstrate' under <u>Chevron</u>'s reasonableness standard or <u>Skidmore</u>'s persuasiveness standard, nothing in the Administrator's order denying [the] petition qualifies as an impermissible interpretation of his burden under § 7661d(b)(2). The Administrator denied [the] petition, in part, because [petitioner] 'failed to provide adequate information to support his claim . . .' [and s]pecifically . . . noted that petitioner 'ma[d]e only generalized statements . . . and d[id] not provide adequate references, legal analysis, or evidence in support of these

general assertions.'" (sixth and eighth alterations in original)); <u>Finger Lakes Zero Waste Coal., Inc. v. E.P.A.</u>, 734 F. App'x 11, 15 (2d Cir. 2018) (concluding that EPA did not act arbitrarily or capriciously in denying petition for an objection because "insofar as the . . . petition requested that the EPA object to the permit, the petitioner did not respond to or engage the 2015 Source Determination [and, a]s a result, the petition was plainly inadequate under the relevant statutory framework"). We agree with the <u>MacClarence</u> Court that "[b]ecause a petition that properly demonstrates that a permit is not in compliance with the CAA requires the Administrator and state permitting authority to take certain action, the Administrator's requirement that [petitioner] support his allegations with legal reasoning, evidence, and references is reasonable and persuasive." 596 F.3d at 1131. We thus conclude that the Administrator's interpretation of "demonstrates" in § 7661d(b)(2) is entitled to deference.

Finally, the Voigts' arguments about the lack of a notice and comment period after the April 2020 Stationary Source Determination memo and the Administrator purportedly requiring the Voigts to respond to a document that was not available until two months after they submitted their petition do not change our conclusion. As to the lack of notice and comment for the July 2020 petition, the Voigts never identified the lack of notice and comment as a basis for an objection in their 2020 petition, which waives the argument. <u>See</u> <u>Ballanger v. Johanns</u>, 495 F.3d 866, 871 (8th Cir. 2007) ("[I]ssue exhaustion is required, and we need not address the arguments that [petitioner] failed to specifically present to the agency."). As to the Voigts' argument that the Administrator's decision in denying their petition would have required them to have included a response to a document that was not published until after they filed their 2020 petition, the record does not support the conclusion that this document played any part in the Administrator's decision. We therefore conclude that the Administrator did not act arbitrarily or capriciously in denying the Voigts' 2020 petition.[2]

_____

[2]As we conclude that the Administrator did not act arbitrarily or capriciously in denying the Voigts' petition based on deference to the EPA's interpretation of § 7661d(b)(2), we need not consider the EPA's argument that the Administrator's

### III.

Accordingly, we deny the petition for review.

COLLOTON, Circuit Judge, dissenting.

The Voigts have established that the EPA Administrator's denial of their petition under 42 U.S.C. § 7661d(b)(2) was arbitrary and capricious, because the Administrator refused even to address their principal argument. I would therefore vacate the Administrator's decision and remand for further proceedings.

In challenging the permitting decision of the North Dakota agency, the Voigts have argued consistently that Coyote Station and Coyote Creek Mine are under common control. The crux of their argument is that certain key provisions of a Lignite Sales Agreement between the parties demonstrate that Coyote Station has control over Coyote Creek Mine. They rely principally on contract provisions that (1) give Coyote Station authority to disapprove or modify Coyote Creek Mine's mining plans, and (2) give Coyote Station authority to approve or disapprove Coyote Creek Mine's capital expenditures.

In granting a permit, however, the North Dakota Department of Environmental Quality simply ignored those sections of the Agreement. The Voigts petitioned the Administrator to object to the state permit decision, emphasizing that the North Dakota agency "cherry-picked parts of the [Lignite Sales Agreement] and ignored almost all of the provisions cited by the Voigts."

The Administrator then denied the petition on the ground that the Voigts failed to rebut the particular reasoning offered by the North Dakota agency. But the whole

decision was also supported by the EPA's interpretation of "explain" as used in 40 C.F.R. § 70.12(a)(2)(vi). Further, we also need not consider the Voigts' substantive argument regarding whether Coyote Station and Coyote Creek Mine are under common control.

-12-

point of the Voigts' petition was that the reasoning of the North Dakota agency ignored the key provisions of the Lignite Sales Agreement. There is no need for a petitioner to rebut a state agency's conclusion that provisions "A" and "B" in a sales agreement do not demonstrate common control when the petitioner's contention is that provisions "C" and "D" demonstrate common control. Whatever ambiguity might lurk in the word "demonstrates," 42 U.S.C. § 7661d(b)(2), and whatever deference is due the Administrator under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837 (1984), it is unreasonable, arbitrary, and capricious for the Administrator to ignore a petitioner's argument that the state agency failed to consider the most important factors bearing on common control.

The Administrator is well aware of the shortcomings in the North Dakota agency's decision. In an original review of this matter in November 2018, the EPA acknowledged the contract provisions cited by the Voigts. The EPA declared that the state agency "should take account of these contract provisions in order to ascertain whether they provide Coyote Station the relevant type and extent of 'control' over [Coyote Creek Mine's] operations, such that both entities' activities are either under the control of 'the same person' or under the control of 'persons under common control.'" In further proceedings, however, the North Dakota agency refused to consider those contract provisions, and later declared them "irrelevant."

When the Voigts complained in their petition to the EPA about the state agency's obstinacy, the Administrator never evaluated whether the state permit was in compliance with the applicable requirements of the Clean Air Act. Instead, the Administrator resorted to an unreasonable construction of the word "demonstrates" to avoid the issue. At the same time, the Administrator took pains to stress that his decision "should not be read to reflect the EPA's agreement with any particular element of [the North Dakota agency's] reasoning," emphasized that the EPA "would have considered different facts to be more relevant," and specifically disagreed with the state agency's assertion that the key provisions of the Lignite Sales Agreement are "irrelevant."

I would vacate the Administrator's decision and remand with directions to consider the Voigts' argument—namely, that the state permit is not in compliance with the applicable requirements of the Clean Air Act because key provisions of the Lignite Sales Agreement ignored by the state agency show that Coyote Station and Coyote Creek Mine are under common control.

_____